# United States Court of Appeals
## For the First Circuit

No. 00-1325

UNITED STATES,

Appellee,

v.

RONALD ANTHONY ABBOTT, a/k/a,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Selya, Circuit Judge

Coffin and Campbell, Senior Circuit Judges.

Frank D. Inserni, by appointment of the Court, for appellant.
Edwin Vazquez Berrios, Criminal Division, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Chief, Criminal Division, Nelson Perez-Sosa, Assistant United States Attorney, were on brief for appellee.

February 23, 2001

**CAMPBELL, Senior Circuit Judge.** Defendant-Appellant Ronald Abbott ("Abbott") appeals from the denial of his motion to withdraw his guilty plea. He also appeals from the denial of his motions (1) to change venue and (2) for discovery of grand jury minutes pursuant to Rule 12 and Rule 6(e)(3)(c)(ii), and to dismiss the indictment for insufficiency of the evidence. Because we hold that one of the core concerns of Rule 11 was violated, to wit, voluntariness, Abbott must be allowed to withdraw his plea. As the district court's denial of Abbott's additional motions relied on the validity of his guilty plea, we vacate the denials and direct the district court to reconsider those motions to the extent material after remand.

## I. BACKGROUND

The relevant facts are as follows. On September 14, 1996, at a gun show in Miami, Florida, Abbott agreed to purchase a MAADI, 7.62 caliber assault rifle, serial number AC0068536, for an acquaintance who was also at the gun show, a Mr. Luis O. Rodriguez-Navarro ("Rodriguez-Navarro"). The following day, upon deplaning a flight from Miami to San Juan, Puerto Rico, Rodriguez-Navarro and his traveling companion, Orlando Ramos-Rivera ("Ramos-Rivera") (who was also at the gun show) were arrested at the Luis Munoz Marin International Airport in San Juan. In their possession were three suitcases containing

-3-

fourteen firearms, among them the MAADI assault rifle procured for them by the defendant Abbott.

Abbott was on the same flight from Miami to San Juan, but he was neither detained nor arrested until February 20, 1997, five months later, in his home town of Del Rio, Texas. The indictment dated February 12, 1997, charged Abbott with four firearm-related counts, all directly related to the seizure of the fourteen firearms from the suitcases of Ramos-Rivera and Rodriguez-Navarro on September 15, 1996. They are: two counts of unlawfully dealing in firearms in violation of 18 U.S.C. § 922(a)(1)(A) (counts I and III); transferring firearms to a non-resident in violation of 18 U.S.C. § 922(a)(5) (count II); and possessing firearms with obliterated serial numbers in violation of 18 U.S.C. § 922(k) (count IV). Only counts I and II mentioned the MAADI rifle transferred at the Miami gun show.

Sometime in April, unable to make bail and after having been transferred from Texas to Puerto Rico, Abbott wrote a letter to a young woman inquiring if "Luis [Rodriguez-Navarro] or Orlando [Ramos-Rivera] said anything." In that same letter, Abbott told the young woman that if asked about her knowledge concerning the circumstances of Abbott's arrest, she needn't say anything. Around the same time, Abbott telephoned his mother, Judith Baerga Abbott, with the request that she contact the same

-4-

young woman to whom he had written and suggest to the young woman that should she be questioned about the circumstances of his arrest, she wasn't to remember anything.  Judith Baerga Abbott placed the phone call and fulfilled her son's request.

Within the month, on April 30, 1997, a superceding indictment issued against Abbott, adding a fifth count charging him with witness tampering, and also adding his mother as a co-defendant, charging her with witness tampering as well (count VI).  Judith Baerga Abbott was arraigned on May 1, 1997, and released on bond of $35,000 three weeks later.  The case of the United States versus Ronald Abbott and Judith Baerga Abbott was set for a jury trial on September 3, 1997, when, on August 27, 1997, Ronald Abbott moved to change his plea.  His mother followed suit a week later on September 2, 1997.  On October 9, 1997, Chief Judge Carmen Cerezo accepted the guilty pleas of both Ronald Abbott and Judith Baerga Abbott.  After taking Ronald Abbott's plea of guilty to Count I (all other counts were dismissed pursuant to a plea agreement), the district court accepted his mother's plea of guilty to count VI, the only count against her.  The substance of this appeal concerns the sufficiency of that Rule 11 colloquy between the district court and Ronald Abbott, the factual details of which precede the legal analysis in Part II infra.

A brief recitation of the subsequent procedural history will help clarify matters. On January 16, 1998, Ronald Abbott filed a motion to, among other things, change venue and withdraw his guilty plea on the ground that it was involuntary. On February 13, 1998, Judith Baerga Abbott was sentenced to two years of probation. On May 18, 1998, the district court denied Abbott's motion to withdraw his guilty plea and denied as moot his motion to change venue. A flurry of motions to reconsider and to change conditions of release pending sentencing were filed, denied and appealed. Abbott's sentencing hearing was continued over the course of nearly two years due to disagreements about, among other things, the contents of the Pre-Sentence Report. On May 24, 1999, still not sentenced, Abbott filed a motion for discovery of grand jury minutes in order to challenge the indictment. On June 1, 1999, the district court summarily denied the motion. After taking evidence bearing on Abbott's sentence, on January 14, 2000, Chief Judge Cerezo sentenced Ronald Abbott to 46 months in prison and three years of supervised release.

Ronald Abbott filed a notice of appeal on January 21, 2000. As of August 21, 2000, the day his brief was filed with this court, counsel for Ronald Abbott represented that Abbott

had finished serving his jail time and was successfully carrying out the terms of his supervised release.

## II.  ANALYSIS

Abbott's central contention is that his guilty plea was coerced.  He asserts that during plea negotiations the government offered to recommend that his mother, upon a plea of guilty to Count VI, serve no jail time if Abbott would plead guilty to Count I.  The government would then drop the remaining four counts against him. Abbott characterizes the government's offer as a "package deal" -- i.e., conditioning the acceptance of his mother's guilty plea and her recommended sentence on Abbott's plea of guilty -- the details of which were not disclosed to the district court, contrary to the mandate of Rule 11.  See Fed. R. Crim. P. 11(d) ("The court shall not accept a plea of guilty . . . without first . . . determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement."); Fed. R. Crim. P. 11(e)(2) ("If a plea agreement has been reached by the parties, the court shall, on the record, require the disclosure of the agreement in open court. . . .").

The plea agreements between the government and Ronald Abbott and the government and Judith Baerga Abbott that were

submitted to the district court in preparation for the Rule 11 hearing on October 9, 1997 do not mention any linkage between the co-defendants' pleas. As reflected by the record in this case, however, after Ronald Abbott pled guilty to Count I, Judith Baerga Abbott pled guilty and, upon the government's recommendation pursuant to her plea under Fed. R. Crim. P. 11(e)(1)(C)[1], she was sentenced to only two years probation. When, later, Ronald Abbott moved to withdraw his plea as being involuntary, the government responded by acknowledging in its Response filed with the court that "during the negotiation process, the pleas of both defendants were linked to some degree. During negotiations, the United States indicated its belief that a plea agreement which reflected a degree of leniency with respect to co-defendant Judith Baerga, the defendant's mother, may be appropriate." The government then went on to defend its non-disclosure of the self-styled "leniency" toward Judith Baerga Abbott by saying that "[w]hile the United States indicated that it would be inclined to be more lenient with the defendant's mother were he to plead guilty, it did not consider the plea agreements to be a 'package deal'

---

[1] When a defendant agrees to enter a plea pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C), she does so in light of the government's express promise that the government will "agree that a specific sentence [in this case probation] ... is the appropriate disposition of the case."

-8-

within the legal sense." At issue now is whether the failure of the government to disclose to the court at the Rule 11 hearing that the two pleas were linked in the way the government describes renders Abbott's plea of guilty involuntary. We hold that it does.

Withdrawal of a guilty plea prior to sentencing may be granted for any "fair and just reason." Fed. R. Crim. P. 32(e). The district court is to apply this standard liberally. We reverse the district court only for abuse of discretion. See United States v. Daniels, 821 F.2d 76, 78 (1st Cir. 1987). We have said, however, that in the Rule 11 context, when any one of its so-called "core concerns" is implicated, a concern such as whether the plea was coerced and not voluntary, see United States v. Cotal-Crespo, 47 F.3d 1, 4 (1st Cir. 1995), "'discretion' may be somewhat more limited," United States v. Raineri, 42 F.3d 36, 41 (1st Cir. 1994).

Full disclosure to the district court of the material terms of plea agreements is necessary to insure that the Rule 11 colloquy is thorough and searching as to defendant's knowing, intelligent and voluntary waiver of the right, among others, to a jury trial. See McCarthy v. United States, 394 U.S. 459, 466 (1969) (stating that for a guilty plea to be valid, due process requires that the plea amount to a voluntary and "intentional

relinquishment or abandonment of a known right or privilege"). Package deals pose particular problems with regard to voluntariness because "[q]uite possibly, one defendant will be happier with the package deal than his codefendant(s); looking out for his own best interests, the lucky one may try to force his codefendant(s) into going along with the deal." United States v. Martinez-Molina, 64 F.3d 719, 733 (1st Cir. 1995) (quoting United States v. Caro, 997 F.2d 657, 659-60 (9th Cir. 1993)). The Supreme Court has noted that tying co-defendants' pleas together "might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risk a defendant must consider." Bordenkircher v. Hayes, 434 U.S. 357, 364 n.8 (1978). For these reasons, the disclosure of the existence of a package plea deal is crucial at the Rule 11 hearing so that the district court may probe as deeply as needed into the possibility that one defendant is pleading guilty against his will in order to make it possible for his co-defendant to obtain the benefit of a favorable plea and sentencing recommendation. See Martinez-Molina, 64 F.3d at 733 (stating that "[p]ackage plea deals therefore impose special obligations: the prosecutor must alert the district court to the fact that codefendants are entering a package deal, and the district court must carefully

ascertain the voluntariness of each defendant's plea")(citations omitted).

The transcript of the Rule 11 colloquy in this case shows no awareness at the time by the district court of the connection between Abbott's plea and his mother's plea. The district court, therefore, would have had no reason to conduct a more searching inquiry into whether Ronald Abbott was voluntarily pleading guilty or whether he was pleading guilty mainly to help his mother. Cf. id. (where one question before the court was whether, in view of the district court's knowledge during the plea hearing of the existence of a package deal, the court conducted a thorough voluntariness inquiry in light of the potential coercive aspects of the agreement). The Rule 11 transcript evidences at best a cursory dialogue regarding voluntariness.

In contrast to the government's failure to reveal at the Rule 11 hearing the linkage between the two pleas, the government later conceded in its Response to Abbott's motion to withdraw his guilty plea that there was such a linkage. In that Response, the government admitted to the district court that the two pleas were linked and that "the defendant may have felt that his plea of guilty would, to some degree, benefit his mother." The court also had before it a report from a clinical

-11-

psychologist of an interview with Abbott taken six weeks after his guilty plea during which Abbott claimed to have "pled guilty to the charge against him to help his mother." The government, in fact, did not at this time oppose Abbott's motion to withdraw his guilty plea. To the contrary, the government told the district court that it "[b]elieves that prudence counsels in favor of permitting the defendant to withdraw his guilty plea."[2] Notwithstanding that recommendation by the prosecution, the district court denied Abbott's motion to withdraw his guilty plea.

In denying defendant's motion, the district court appears to have accepted as true Abbott's claim that he pled guilty to prevent his mother from going to prison. The district court also recognized the relevant factor that in his motion to withdraw Abbott asserted a claim of innocence. See United States v. Isom, 85 F.3d 831, 834 (1st Cir. 1996) (citing as relevant when considering a defendant's motion to withdraw a guilty plea under Rule 32(e) the following four factors: (1)

---

[2] At oral argument of this appeal, the government said that this response was based on the fact that it was ready for trial and that it would suffer no prejudice should the judge grant defendant's motion. While certainly this may have been a factor, it was not the reason given by the government to the district court in its Response to Abbott's motion to withdraw. In the Response, the government virtually conceded that Abbott may have felt coerced into pleading guilty in order to save his mother from serving a jail sentence.

the plausibility and weight of the proffered reason; (2) the timing of the request; (3) whether the defendant asserted legal innocence; and (4) whether the parties had reached, or breached, a plea agreement). Nevertheless, the district court weighed heavily the fact that the defendant "under oath, stated that the plea was being made knowingly and voluntarily." The district court also apparently considered it significant that Abbott "waited to raise this issue after his mother was sentenced and benefitted from her plea agreement."[3] Echoing the district court's reasoning, the government now argues on appeal that because Abbott got the benefit of the bargain – his mother stayed out of jail – he cannot now be heard to complain that his plea was involuntary. This argument turns the rule of voluntariness on its head.[4]

---

[3] On this point, the district court's statement seems to be an erroneous reading of the record. By our reading, Ronald Abbott moved to withdraw his guilty plea in a self-styled "Emergency Motion" filed on January 16, 1998, and Judith Baerga Abbott was sentenced to two years probation nearly a month afterwards on February 13, 1998.

[4] To say the plea must have been voluntary because Abbott received the benefit of a secret deal – kept secret from the judge thereby preventing a more thorough-going inquiry concerning voluntariness – suggests that all bargains that are adhered to, no matter the imbalanced nature of the negotiations, are voluntary. This is not the law, either in civil or criminal cases.

We recognize that Abbott remained silent during the Rule 11 hearing regarding the connection between his plea and his mother's plea. In the circumstances, however, Abbott could well have believed that only by keeping quiet as to the linkage would he prevent his mother from going to jail. He may have thought that if the bargain were disclosed his own plea would be rejected and his mother would be tried and sentenced to prison. An undisclosed bargain such as the instant one carries with it a serious possibility of coerciveness. This is why the prosecution must shoulder the burden of disclosing, in the first instance, all material information of plea agreements, including a package deal like this one. See Martinez-Molina, 64 F.3d at 733; Caro, 997 F.2d at 659 & n.2 (announcing as a rule that it is the prosecutor's duty to "alert the district court to the fact that co-defendants are entering a package deal").

This is not a case in which belated assertions of involuntariness lacked any "affirmative eviden[tiary]" support. United States v. Marrero-Rivera, 124 F.3d 342, 349 (1st Cir. 1997). The evidence before the district court filed in support of and in response to defendant's motion to withdraw rebuts the presumption accorded the sworn statements of defendants during Rule 11 hearings. See Martinez-Molina, 64 F.3d at 733. Faced with the undisputed fact that the two pleas were linked and with

the government's admission, for which it is to be commended, that it would suffer no prejudice should the motion be granted, it was clear error to deny defendant's motion to withdraw absent a hearing on the issue to make further inquiries into the voluntariness of Abbott's plea.

Our conclusion of coercion and involuntariness is further necessitated by relevant case law in this circuit, case law that was not cited to or by the district court. In United States v. Daniels, this court reversed a denial of a motion to withdraw a guilty plea due to the government's failure to disclose the linkage of co-defendants' guilty pleas. See Daniels, 821 F.2d at 77. In Daniels, we found the prosecutor's nondisclosure, in light of (1) the swiftness with which one defendant moved to withdraw his plea and (2) his protested innocence at the change of plea hearing, enough that a "fair and just" reason existed to allow the defendant to withdraw his plea. Id. at 79-80.

The circumstances of the present case are not unlike those in Daniels. Like the defendant in Daniels who was caught between loyalty to his brother and his own future, Abbott was presumably struggling with loyalty to his mother and a lengthy prison sentence. Like the Rule 11 colloquy in Daniels in which the defendant provided suspiciously reluctant and halting

-15-

responses to questions regarding voluntariness and the truth of the facts underlying the government's case against him, see id. at 79, Abbott protested his innocence at length, evidencing confusion and resistance to the proceeding in which his knowing assent was required.

> Q:      Did you commit the offense charged in Count One, Mr. Abbott?
>
> A:      Your Honor, I'm pleading guilty for selling one rifle at the regular gun show. For the -- I'm pleading guilty for that part of it . . .
>
>       . . . .
>
> Q:      Paragraph three says that before arriving at the Luis Munoz Marin International Airport, Rodriquez-Navarro and Ramos-Rivera, who both reside in Puerto Rico, flew to Miami, Florida, to obtain firearms, which they did. And that they imported those weapons into Puerto Rico to distribute them. Did you know that they were doing that?
>
>       . . . .
>
> A.      No, Your Honor.
> Your Honor, I sold one rifle to these -- to one person. As far as everything else that they put in here, I have no knowledge of that. But I'm being accused of it because I sold one rifle which ties me to the 14. But as far as selling 14 weapons, no.
> I sold one rifle at the show, which was legal in the State of Florida, which is considered illegal

-16-

in Puerto Rico, and that's what I'm pleading guilty to.

As in <u>Daniels</u>, "disclosure of the government's all-or-nothing negotiating position might well have led the court to investigate further into possible coercion by appellant's codefendants. Further investigation would have produced a fuller record . . . with which to assess the voluntariness of the plea." <u>Id.</u> at 89. <u>See</u> <u>also</u> <u>McCarthy</u>, 394 U.S. at 465 (noting that the procedures established in Rule 11 are "intended to produce a complete record at the time the plea is entered of the factors relevant to his voluntariness determination").

The government contends that the terms of Abbott's plea were not the kind of "all-or-nothing" deal with which the defendant in <u>Daniels</u> was faced. Strictly speaking, the government says, the linkage between Abbott's plea and his mother's is not a "package deal" as they were not identical pleas and because they were filed pursuant to different statutes. The government also offers as proof of the independence of the pleas the fact that when Abbott moved to withdraw his plea, his mother's plea was not adversely affected. But the government cites no case law that would support the proposition that the two separate plea agreements binding two separate defendants be identical in order to qualify as a "package deal." And the fact that the government did not renege

-17-

on its deal with Judith Baerga Abbott even after her son filed a motion to withdraw his guilty plea proves only that the government adhered to the terms of its written plea agreement with Judith Baerga Abbott, not that there was no coercive linkage between the two agreements as originally signed and accepted by the district judge during the Rule 11 hearings.

In the end, the government's failure to bring to the judge's attention the fact that the two guilty pleas that she was accepting were tied to one another, viz, conditioning the acceptance of Judith Baerga Abbott's guilty plea and the lenient sentence of probation on her son's plea of guilty to Count I, rendered the Rule 11 colloquy between Ronald Abbott and the district court defective. Without this crucial information, the district judge could not adequately ascertain whether Ronald Abbott was pleading guilty of his own volition or because of undue pressure to save his mother from prison. This error at the Rule 11 hearing was not harmless, see Rule 11(h), because whether a plea is voluntary, intelligent and knowing "is the touchstone for determining whether substantial rights have been violated in the acceptance of the guilty plea." Caro, 997 F.2d at 660. See also Marrero-Rivera, 124 F.3d at 348 ("[T]otal failure to address any 'core concern' mandates that a guilty plea be set aside. Otherwise, we consider whether any

particular defect in the Rule 11 hearing affected the defendant's 'substantial rights.'"); Martinez-Molina, 64 F.3d at 734 ("Where a district court has only partially addressed one of Rule 11's core concerns, we must reverse a determination that there was no fair and just reason to set the plea aside unless the irregularities in the plea proceeding do not affect 'substantial rights' of the defendant."). Furthermore, in its response to Abbott's motion, the government admitted to the district court that it would suffer no prejudice in the event that Abbott was permitted to withdraw his plea. See Daniels, 821 F.2d at 79; United States v. Kobrosky, 711 F.2d 449, 455 (1st Cir. 1983). For all these reasons, the district court's refusal to allow the defendant to withdraw his plea was an abuse of discretion.

Lastly, because we are convinced that upon consideration of the totality of the circumstances surrounding the Rule 11 hearing, see Cotal-Crespo, 47 F.3d at 3, the district court would have concluded that Abbott did not plead guilty free of undue influence, we will not remand for an evidentiary hearing on voluntariness but rather will direct the district court on remand to allow Abbott to withdraw his guilty plea.

Denial of Motion to Withdraw Guilty Plea is reversed and remanded for further proceedings not inconsistent with this opinion.  Rulings on other motions are vacated and said motions are remanded for further consideration should they be renewed.