# United States Court of Appeals
## For the First Circuit

No. 02-2668
    02-2670

UNITED STATES OF AMERICA,

Appellee,

v.

GERALDO MESCUAL-CRUZ; NELSON MESCUAL-CRUZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José A. Fusté, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
Schwarzer,* Senior District Judge.

Laura Maldonado Rodríguez for appellant Geraldo Mescual-Cruz.
Guillermo A. Macari-Grillo for appellant Nelson Mescual-Cruz.
Nelson Pérez-Sosa, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, Sonia I. Torres-Pabón, Assistant United States Attorney, Chief, Criminal Division, and Germán A. Rieckehoff, Assistant United States Attorney, were on brief, for appellee.

October 15, 2004

*Of the Northern District of California, sitting by designation.

**LYNCH, Circuit Judge**. This is an appeal from denials of motions to withdraw guilty pleas which involve the law on package pleas.

Defendants Geraldo Mescual-Cruz (Geraldo) and Nelson Mescual-Cruz (Nelson), who are brothers, along with four co-defendants pled guilty to federal drug conspiracy charges on April 8, 2002. The pleas were part of a package deal, that is, the government's offer was contingent on all defendants entering plea agreements. Sometimes these are referred to as "wired" pleas, that is, two or more pleas are linked. The package deal was reached late in the afternoon on the first day of trial, after jury impanelment in the morning, but before witnesses were presented. Earlier pre-trial plea negotiations had not succeeded in reaching an agreement.

This Circuit's case law requires particular care be exercised both by the government and by the court in package guilty plea situations due to certain risks inherent in package pleas which could affect the voluntariness of the plea. United States v. Abbott, 241 F.3d 29, 34 (1st Cir. 2001); United States v. Sanchez-Barreto, 93 F.3d 17, 23 (1st Cir. 1996); United States v. Martinez-Molina, 64 F.3d 719, 733 (1st Cir. 1995); United States v. Daniels, 821 F.2d 76, 80 (1st Cir. 1987). The district court, informed by the government that this was a package deal situation, had continued the trial at the request of defense counsel to give time

-2-

for negotiations. The court was informed that the negotiations were successful and took the pleas. The court, at the Rule 11 colloquy, asked some questions individually of each defendant and some of the group. Satisfied that the pleas were voluntary, the court accepted the pleas from all defendants.

Over two months later, Geraldo filed two motions to withdraw his pleas. He asserted other grounds than that the plea was part of a package deal, but did say he had felt pressured. Nelson, Geraldo's brother, also filed a motion to withdraw. That motion also did not rely on the package nature of the deal. Both motions alleged a different sort of pressure stemming from related murder charges pending against Nelson and Geraldo in Puerto Rico court. The Commonwealth charge had not been resolved when the defendants pled guilty on April 8, 2002, to the federal charges. The defendants had unsuccessfully argued for postponement of the federal trial until the Commonwealth murder charges were resolved (eventually they were acquitted).

The court denied both motions to withdraw after a hearing in which each defendant declined the opportunity to testify. Neither defendant argued that the package nature of the plea deal put them under such pressure that their pleas were not voluntary. That argument is made for the first time on this appeal from the denials of the motions to withdraw.

Both argue that it was plain error for the district court to fail to perform a more searching inquiry into whether the package plea had been entered into voluntarily. They ask this court to remand the case to allow them to withdraw their guilty pleas and proceed to trial or, in the alternative, to require the district court to hold an evidentiary hearing on the voluntariness of their guilty pleas. Finally, Geraldo argues that the district court's failure to have the interpreter translate his allocution statements into English violated the Jones Act, 48 U.S.C. § 864, and the Court Reporter Act, 28 U.S.C. § 753(b), and effectively deprived him of his right to allocution.

We find that the district court did not commit plain error in denying the motions to withdraw, and the Jones and Court Reporter Acts errors were harmless. We affirm.

**I.**

Geraldo and Nelson are brothers. At the time of the plea, they were 32 and 30 respectively. On August 30, 2001, the grand jury returned an indictment against Geraldo and Nelson and seven other co-defendants. Count One charged them with conspiracy to possess with intent to distribute in excess of one kilogram of heroin, five kilograms of cocaine, five kilograms of cocaine base, and in excess of fifty pounds of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two of the indictment sought forfeiture under 18 U.S.C. § 982.

On September 12, 2001, Geraldo and Nelson were arrested, pursuant to an arrest warrant issued on August 30, 2001. On September 25, 2001, Geraldo and Nelson pled not guilty to both counts of the indictment. The court set a trial date of April 8, 2002, and the jury trial was set to begin for Geraldo and Nelson, and four other co-defendants, Nelson Delgado-Vazquez, Juan A. Torres, Yazugui Alvarado-Maldonado, and Angel Muniz-De Jesus.

The morning the trial started, counsel for all of the defendants approached the prosecutor and asked if the government would extend a plea offer. The prosecutor had made an earlier plea offer, but it had expired on April 1, 2002. The government said it would not simply extend the old offer; it made a new offer which increased the length of the sentences and made any plea contingent on it being a package deal.

Apparently the court was told there were negotiations and did not resume the trial immediately after the lunch break. Later that afternoon at 5:00 pm, the court noted that it had interrupted the trial to permit negotiations. One of the defense counsel asked to delay further because he was still explaining the pleas to his client. At that point, two defendants, Muniz and Alvarado, had tendered pleas. The court indicated that it would take those two pleas and resume trial in the morning as to the other four defendants.

When defense counsel asked for more time, the court asked why counsel had not considered all this before trial. Counsel for Torres said they had considered it before that day and that he had brought the offer to his client several weeks before. Counsel for Delgado then said, "I think there is a reasonable guarantee that if we wait for another ten minutes everyone will plea[d]." The government then put on the record that its earlier plea offer had expired on April 1 and the new offer to each defendant was contingent on it being a package deal. This was the first time that the court was informed of the package nature of the plea. Counsel for Geraldo and Nelson said nothing.

The court granted the extra time, telling the defendants that they should know nobody was forcing them and no one could force them to plead guilty. After that break (the record does not indicate its duration) the court was presented with guilty pleas from all defendants. Each of the defendants was present.

The court proceeded to take the defendants' guilty pleas, informing the defendants that it would have to ask several questions to determine whether the "plea of guilty is done with knowledge of consequences, aware of the fact that you are waiving a number of rights." The court then addressed each defendant individually in turn, asking questions concerning the defendant's competency to plead guilty, his satisfaction with his representation, and whether he had ample opportunity to discuss

with his attorney the implications of his guilty plea. The court received affirmative answers from both Nelson and Geraldo.

After being satisfied that each defendant was competent to plead guilty, the court addressed the defendants as a group. It asked questions concerning whether they understood the rights afforded to them under the Constitution, the rights which they were giving up by pleading guilty. Having discussed those matters, the court asked whether each still wanted to plead guilty and received an affirmative response. The court asked each whether he had seen the indictment, and received affirmative answers.

The court once again addressed the defendants individually to explain the charges against each, what the government would have to prove, and the possible sentence that each might receive. The defendants affirmed that they understood.

The court addressed the group as a whole and asked, "Has <u>anyone</u> threatened you or forced you in any form or fashion or induced you to plead guilty in this case?" (Emphasis added). Each answered no.

Once again, the court addressed each defendant individually to discuss the specifics of each plea agreement and the facts to which each defendant was stipulating. The court confirmed individually that each had done what he was accused of doing. The court then turned to the defendants as a group and asked, "Has <u>anybody</u> made any promises to any one of you to induce

you to plea?" (Emphasis added). All defendants answered no. The final question asked by the court was "[is there] any reason why these pleas should not be accepted?" All attorneys answered no. After ascertaining from the prosecutor that she had the necessary evidence to proceed to trial, the court accepted the pleas.

On June 28, 2002, over two months after the guilty plea was accepted, Geraldo filed a pro se request for withdrawal of his guilty plea. On July 19, 2002, this motion was followed by a verified motion to withdraw the guilty plea. Nelson filed a verified motion to withdraw his guilty plea on July 16, 2002. The government responded in opposition to both on July 31, 2002.

The thrust of Geraldo's motion to withdraw his plea was that he felt pressured by the prosecution's intent to obtain a life sentence because Geraldo was tied to three murders in the course of the conspiracy. The motion implied that the subject of the murders had come up at the last minute. On March 6, 2002, the government gave notice that in its case in chief it would try to prove the involvement of Geraldo (and others) in three murders. However, on March 19, the government gave notice it would not try to tie him to two of the murders, but would introduce evidence tying Geraldo to the murder of Carlos Maldonado Berrios. Geraldo was charged in Puerto Rico court with that murder. In the plea negotiations before trial, the government said it would not negotiate a term of imprisonment below 19 years. The plea offer at the time of trial

was that the government would recommend 20 years. The motion referred to "the pressure he was subject to as the exposure was to a life sentence." The motion never mentioned pressure from the package plea.

The government's opposition to the motion responded to Geraldo's argument and said both allegations were untrue. It pointed out that Geraldo had, on the drug conspiracy charges alone, always faced a potential life sentence, regardless of the murder. The prosecution also pointed out that there was no surprise -- it said that it made clear within three weeks of indictment it would seek to introduce evidence of the murders. The prosecution pointed out that the timing of the motion to withdraw was immediately after Geraldo was acquitted of the murder at trial in the local court and that the defendant merely wanted a second bite at the apple in federal court.

Nelson's motion to withdraw and the government's response to it were similar to Geraldo's. Nelson too argued that the "pressure . . . was extraordinary as a drug conspiracy case had turned into a drug related murder case with a very real exposure of a life sentence." Nelson also made no allegations of pressures associated with the package nature of the plea.

The court held a hearing on the motions for both defendants on August 14, 2002. When asked to give the core argument for withdrawal, Nelson's counsel informed the court,

> [H]e feels that 20 years for his plea is too much time.
> He has told me that he did go for it because he felt at
> that time that he could not do anything else because he
> was here and he felt that he had no other choice except
> to plead guilty.

As to the murder, the counsel stated, "that was one of the issues throughout this case trying to make a plea because we had evidence in his case that there could be, you know, evidence as to murders." As the court correctly pointed out, Nelson's plea did not include any admissions as to murder. The plea only held him responsible for the drug charges. In response to whether Nelson was trying to argue that he was innocent of the drug charges, the counsel replied, "no, your Honor." The court then summed up Nelson's argument: "He is simply saying that [he] took too much time, if you will, by way of a recommendation because of the pressures of an impending trial." The court continued, "[s]o basically this is it. It was too much time [to serve] and it was a lot of pressure and that is too much drugs basically." Nelson presented no evidence, and he chose not to testify.

Geraldo's counsel made similar arguments. He characterized Geraldo's objection as, "[b]asically it is too much time for the amount of drugs that he dealt with. That is basically his point." Geraldo's plea agreement did not contain any admissions as to murder, and he also said he did not wish to testify.

The court found that there was no fair and just reason to allow withdrawal of the guilty pleas. In the plea agreements there were no adjustments for murder or for weapons possession and the defendants pled guilty only to the drug charges. The court stated, "[u]nder these circumstances, I do think that there is nothing on this record to suggest . . . that these pleas were involuntarily entered and there is no reason for me to consider anything other than going ahead with sentencing in due time." In a written order, the court repeated this assertion and stated, "[w]hen their pleas were taken, they did it voluntarily and aware of what they were doing. No suspicion was alerted to the court. Even more, the court asked them if there was any other reason for them not to plead, and they answered in the negative."

On November 21, 2002, both Geraldo and Nelson were sentenced to 235 months in prison and no fine. They were also sentenced to serve a five year term of supervised release, and the court imposed a special monetary assessment of $100.

**II.**

Involuntariness of the Plea

After the district court has accepted the plea and prior to the defendant's sentencing, the district court should liberally allow withdrawal of guilty pleas for any "fair and just reason." Fed. R. Crim. P. 11(d)(2)(B). Once the district court has ruled on the defendant's motion to withdraw the guilty plea, however, the

standard of appellate review is for abuse of discretion on preserved issues. United States v. Daniels, 821 F.2d 76, 78 (1st Cir. 1987). Still, that discretion may be limited where a core concern such as voluntariness is raised and preserved. United States v. Abbott, 241 F.3d 29, 33 (1st Cir. 2001). Here, the defendants do not get the benefit of an abuse of discretion standard of review, because they did not raise the issue of the package nature of the deal before the district court. Accordingly, the review is for plain error. United States v. Vonn, 535 U.S. 55, 59 (2002).

An unobjected-to error in the Rule 11 colloquy is reversible error only upon a showing of plain error. Id. at 63. Since the Supreme Court's decision in 2002 in Vonn, the defendant's failure to raise the objection in the trial court has two consequences. First, it is defendant's burden to satisfy the plain error rule. It is not the government's burden to show any error was harmless. Second, the reviewing court may consider the entire record when assessing the effect of any error on substantial rights. Id. at 74.

To satisfy its burden, the defendant must show four things: 1) an error occurred, 2) the error was clear or obvious, 3) it affected the defendant's substantial rights, and 4) it seriously impaired the fairness, integrity, or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 732-35

(1993); United States v. Gandia-Maysonet, 227 F.3d 1, 5 (1st Cir. 2000). There is no contention that the court's Rule 11 inquiry was insufficient save for these being package pleas.

In package plea arrangements, the prosecutor offers a benefit or detriment to all (the defendant and third parties) in order to persuade the entire group of defendants to plead guilty. These types of arrangements are not per se involuntary. Still, package plea deals raise at least two types of risks. The first is that a defendant is coerced by co-defendants to plead guilty involuntarily. One defendant may be coerced into pleading guilty by a co-defendant who believes he is getting a good deal under the package deal. United States v. Martinez-Molina, 64 F.3d 719, 732-33 (1st Cir. 1995). The second is that there may be a family relationship between two defendants which leads one defendant to involuntarily sacrifice his own best interests for those of a family member (or perhaps both family members to involuntarily sacrifice themselves) in a belief that the package deal will

benefit the other.[1]  <u>Abbott</u>, 241 F.3d at 33; <u>Daniels</u>, 821 F.2d at 79.

As to this second risk, there is a distinction to be drawn.  The concern of the law is for voluntariness.  "If a defendant elects to sacrifice himself [to protect someone close to him] that is his choice, and he cannot reverse it after he is dissatisfied with his sentence, or with other subsequent developments."  <u>United States</u> v. <u>Buckley</u>, 847 F.2d 991, 1000 n.6 (1st Cir. 1988)(quoting <u>Kent</u> v. <u>United States</u>, 272 F.2d 795, 798 (1st Cir. 1959)).

On the other side of the coin from these risks, package plea situations present the possibility of manipulation of the

---

[1] Earlier, the Supreme Court in a footnote raised an issue of whether the "offer during plea bargaining of adverse or lenient treatment for some person <u>other</u> than the accused" could render an individual's plea involuntary.  <u>See</u> <u>Bordenkircher</u> v. <u>Hayes</u>, 434 U.S. 357, 365 n.8 (1978).  This circuit, along with several others, has since held that such arrangements do not render the plea involuntary.  <u>See</u> <u>United States</u> v. <u>Buckley</u>, 847 F.2d 991, 1000 n.6 (1st Cir. 1988) (rejecting the defendant's argument that an agreement promising lenient treatment of a pleading defendant's family member is substantively unfair); <u>United States</u> v. <u>Tursi</u>, 576 F.2d 396, 398 (1st Cir. 1978) (allowing defendant's plea to be tied to the prosecutor's recommendation of a lighter sentence for the defendant's son, when defendant was advised of the consequences of pleading guilty and was counseled that any recommendation made by the prosecution regarding the son's sentence would in no way bind the court); <u>see also</u> <u>United States</u> v. <u>Vest</u>, 125 F.3d 676, 678-79 (8th Cir. 1997); <u>United States</u> v. <u>Marquez</u>, 909 F.2d 738, 741-42 (2nd Cir. 1990); <u>United States</u> v. <u>Morrow</u>, 914 F.2d 608, 613-14 (4th Cir. 1990); <u>Politte</u> v. <u>United States</u>, 852 F.2d 924, 929-30 (7th Cir. 1988); <u>United States</u> v. <u>Castello</u>, 724 F.2d 813, 814-15 (9th Cir. 1984); <u>United States</u> v. <u>Diaz</u>, 733 F.2d 371, 374-75 (5th Cir. 1984).

system: one defendant obtains a benefit for a co-defendant and then moves to withdraw his own plea, the benefit having been given. Daniels, 821 F.2d at 79. Benefits accrue to the individual defendants involved, from both the traditional prosecutorial bargaining chips and the elimination of the dilemma where one co-defendant is pressured to plead by the fear that another co-defendant will plead and then testify against him. In the package plea situation, defendants can be confident that all co-defendants are pleading guilty. Here, each defendant received a benefit of avoiding the risk of a life sentence.

This circuit has crafted a two-part rule in package guilty plea situations to ensure voluntariness. First, the prosecution should inform the trial court before the Rule 11 colloquy that the plea is a package deal so that the court is aware of the situation. Second, the court's ensuing colloquy should show sensitivity to the issue of voluntariness in light of those pressures. Martinez-Molina, 64 F.3d at 733. We have not, though, mandated that extra procedures be followed, only that the court should assess voluntariness with an eye to the special situation.[2]

---

[2] The Government has confessed error and is not defending the district court's ruling. The court of appeals is not obligated to accept legal propositions "even where the parties are agreed, merely because there is no adversary dispute or presentation on the particular issue." Computervision Corp. v. Comm'r of Internal Revenue, 164 F.3d 73, 75 (1st Cir. 1999); United States v. Tulloch, 380 F.3d 8, 11 n.2 (1st Cir. 2004). When determining whether to address conceded issues, pertinent considerations include: 1) whether the issue is recurrent so that decision would give guidance

<u>Cf.</u> <u>United States</u> v. <u>Holland</u>, 117 F.3d 589, 594 (D.C. Cir. 1997)(recognizing that "wired" pleas can be coercive, but refusing to mandate a special voluntariness inquiry by the district court when faced with a wired plea)(citing <u>United States</u> v. <u>Farley</u>, 72 F.3d 158, 163 (D.C. Cir. 1995)).[3]

The greatest risk comes when the government has not informed the court that the plea is part of a package deal. Where we have reversed and vacated such pleas, it has been most often when the prosecution failed to make the disclosure to the trial court. <u>Abbott</u>, 241 F.3d at 33-35; <u>Daniels</u>, 821 F.2d at 79-81. Here there is no doubt that the trial court knew the deal was a

to the district courts, 2) whether it would be unseemly to accept, even <u>arguendo</u>, a mistaken legal proposition and reason from it to decide the case, and 3) whether the issues are technical and complex and not explored carefully in existing decisions so that adversary briefing would be critical. <u>See</u> <u>Computervision Corp.</u>, 164 F.3d at 75; <u>Tulloch</u>, 380 F.3d at 11 n.2. In applying these considerations to the case at hand, this court is not obligated to accept, and we do not accept, the government's confession of error which is based on the notion that there are mechanical extra steps which must be taken in order for a package plea Rule 11 colloquy to result in a voluntary plea.

[3] Decisions of other circuits have referred to the special care or inquiry that must be taken to determine voluntariness when pleas involve leniency or linkage to a third person. <u>See</u> <u>United States</u> v. <u>Morrow</u>, 914 F.2d 608, 613-14 (4th Cir. 1990)(noting that "[s]pecial care must be taken to determine the voluntariness of the plea in [package plea] circumstances" and finding no fault in the district court's determination that the package plea was entered into voluntarily when the defendant answered that no one had threatened, persuaded, or induced him into pleading guilty, no one had made any promises of leniency other than those contained in the plea agreement, and the written plea agreement contained the entire plea agreement in the case).

package deal. It was told so by the prosecution in the presence of defendants and their counsel. We reject the defendants' argument that they are entitled to reversal because the government did not formally announce at the Rule 11 colloquy itself _again_ that this was a package deal situation.

The question of the adequacy of the court's inquiry on voluntariness is a bit closer. We review that question in light of the risks inherent in package deals and the plain error standard of review. We need not answer the question of whether the rather spartan colloquy would have been adequate if the package plea issue had been preserved by defendants. The court did not ask a direct question about voluntariness and did not explore whether the nature of the package deal impaired the voluntariness of any of the pleas. A more direct inquiry might have avoided this appeal.

The court did ask the defendants "[h]as anyone threatened you or forced you in any form or fashion or induced you to plead guilty in this case" and "[h]as anybody made any promises to any one of you to induce you to plea?" To both of these questions the defendants answered no. Additionally, at the end of the colloquy, the court asked whether there was "any reason why these pleas should not be accepted?" All counsel for the defendants answered no.

If there were pressures from co-defendants or from the fraternal relationship that led to involuntariness, Nelson and

-17-

Geraldo had adequate opportunity to say so. To the contrary, the defendants' answers to the court's questions indicate that they pled guilty of their own volition, fully aware of the rights they were relinquishing and the charges they were accepting. The defendants' "declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977); United States v. Marrero-Rivera, 124 F.3d 342, 349 (1st Cir. 1997) (despite later assertions that defendant was pressured by attorney to plead guilty, the district court reasonably credited the defendant's sworn statements that he was pleading freely and that no one had attempted to coerce him).

In cases where the district court was aware of the package nature of the plea, we have held the district court's voluntariness inquiry inadequate in only one case. See Martinez-Molina, 64 F.3d at 734. Martinez-Molina held that denial of a motion for withdrawal of a guilty plea was error when the district court inquired only into whether the prosecutor had placed pressure on the defendant. Id. The Rule 11 colloquy was insufficient to ascertain voluntariness because "regardless of whether [the defendants'] guilty pleas were actually coerced by their co-defendants, the literal answer to the court's question could still have been 'yes'." Id.

By contrast, the court's questions here did not limit the defendants' answers; the questions were broad enough to include the

-18-

traditional types of coercion and the unique pressure from a co-defendant or family member that might be present in a package deal. This case is more like United States v. Sanchez-Barreto, 93 F.3d 17 (1st Cir. 1996).[4] In Sanchez-Barreto, the defendants contended that their pleas were involuntary because of their attorneys' recommendations to accept the plea bargains offered by the government on the morning of the first day of trial. The court recognized that "[s]pecial Rule 11 requirements have been designed to minimize the significant risk that 'involuntary' guilty pleas may be tendered in response to package plea bargain offers from the government." Id. at 23. This court found that the Rule 11 colloquy was adequate to satisfy the "threshold voluntariness determinations for Rule 11(d) purposes," when each defendant repeatedly informed the district court that his guilty plea "had not been coerced by anyone . . . ." Id. (emphasis in the original). The court distinguished this acceptable colloquy from the unacceptable colloquy of Martinez-Molina, where the trial court restricted its inquiry to prosecutorial coercion. Id.

Even if the Rule 11 inquiry could have been more probing, there is nothing in the record to suggest that either plea was involuntary due to the package nature of the deal. There is no

---

[4] It is not entirely clear from the opinion whether this plea bargain was in fact a package deal or the defendants and their counsel believed it was a package deal. In the opinion, the court treated it as such for purposes of the Rule 11 inquiry.

indication from the Rule 11 colloquy that the defendants felt pressure from co-defendants or family members. See Daniels, 821 F.2d at 79 (holding the Rule 11 colloquy lacking when the judge was unaware of the package deal and the defendant answered questions during the colloquy in such a manner as to indicate that he was feeling some family pressure to plead guilty).

It is true that in their later motions to withdraw, Nelson and Geraldo complained of pressure, but neither complained of pressure from the fact that the pleas were packaged. Had the issue been raised, the district court could have explored it at the hearing. Further, both defendants had the opportunity to take the stand to explain their concerns, which they declined to do.

Even so, one might argue that a remand to the district court to hold a hearing would be appropriate to eliminate any concern. We decline that option. Even on appeal, defendants have not argued they have suffered harm or that involuntariness occurred as a result of this being a package deal. If brotherhood led to involuntary self-sacrifice, Nelson and Geraldo have never said so. If pressure from co-defendants coerced them into a deal, Nelson and Geraldo have never said so.

Instead they even now offer only prejudice arguments unrelated to the risks of a package plea. Geraldo argues he was pressured because he had only 10 minutes to decide whether to accept the plea. There are two responses. First, the "ten minute"

representation is not true.  Plea negotiations took place before trial and for hours on the day of trial.  Second, even if it were true that only ten minutes were afforded, the lack of time could be a source of pressure regardless of whether the plea offered was a package deal, and "the strategic decision to plead guilty [is] not [necessarily] rendered involuntary by the anxieties and time pressures confronting [the defendant]."  See United States v. Marrero-Rivera, 124 F.3d 342, 350 (1st Cir. 1997).

When asked what Geraldo relied on to demonstrate involuntariness, he replied simply that the plea was a package deal, as though such package plea arrangements inherently cannot be voluntary.  That is not the law.  Additionally, we will not infer lack of voluntariness, as the defendant encourages us to do, from the mere fact that one co-defendant was his brother or the mere fact that many of his co-defendants received lighter sentences.

Nelson articulates a different concern, one which again is unrelated to the package nature of the plea.  His concern stems from the pressure he was under because his Puerto Rico murder trial did not take place before his federal trial and the consequent need to plead on April 8 to the federal charge.  Even this pressure does not render his plea involuntary.  As the government points out, he was not charged with the murder in federal court.  It is true the murder might be relevant conduct for federal sentencing purposes.  Even were Nelson acquitted of the murder, as he was, the murder

-21-

still could have been considered by the sentencing judge. United States v. Watts, 519 U.S. 148, 156 (1997); United States v. Lombard, 102 F.3d 1, 5 (1st Cir. 1996); United States v. Lombard, 72 F.3d 170, 175-76 (1st Cir. 1995). Moreover, his federal sentencing exposure was similar whether or not he was found guilty of the murder in Puerto Rico court. Even if there had been no murder, based solely on the amount of drugs involved in the conspiracy and attributable to him, Nelson faced a possible life sentence.

## III.

Jones Act and Court Reporter Act

Geraldo argues that the court violated the Jones Act, 48 U.S.C. § 864, and the Court Reporter Act, 28 U.S.C. § 753(b), in failing to have the court interpreter translate his statements and then failing to have the translation recorded during the sentencing hearing. He contends that this failure deprived him of his right to allocution. We agree that there was a violation of the two acts, but hold it was harmless. He received the lowest sentence available and, even were he eloquent in his translated allocution, he could not have obtained a lower sentence.

In the context of allocution statements, we have held that the sentencing proceedings were "irremediably flawed and must be held afresh" when the defendant was denied the right of allocution or its functional equivalent under Fed. R. Crim. P.

-22-

32(i)(4)(A)(ii).  United States v. De Alba Pagan, 33 F.3d 125, 130 (1st Cir. 1994).  To achieve functional equivalency,  "the court, the prosecutor, and the defendant must at the very least interact in a manner that shows clearly and convincingly that the defendant knew he had a right to speak on any subject of his choosing prior to the imposition of sentence."  Id. at 129.  Geraldo argues that because the prosecutor did not understand the allocution in Spanish and the court did not order the translation, it was impossible for the prosecutor to interact in the way envisioned in De Alba Pagan.

This part of the case involves two statutes: The Jones Act, 48 U.S.C. § 864, and the Court Reporter Act, 28 U.S.C. § 753(b).  The Jones Act provides that "[a]ll proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language," and the Court Reporter Act mandates that certain proceedings "be recorded verbatim [including] all proceedings in criminal cases [held] in open court."

At Geraldo's sentencing, neither of these things happened.  After the prosecutor offered his recommended sentence, the court asked Geraldo whether he had anything he wished to say.  Geraldo read a written statement in Spanish.  This statement was not translated by the court interpreter, and it was not transcribed into the record.  However, the court was fluent in Spanish, and the handwritten statement itself was included in the record.

-23-

Violations of these acts do not require automatic reversal. "[N]othing prescribes automatic reversal of a defendant's convictions for non-compliance with [the Court Reporter Act]. Rather, to obtain reversal and a new trial, the defendant must demonstrate specific prejudice to his ability to perfect an appeal, beyond mere non-compliance with the Court Reporter Act." United States v. Smith, 292 F.3d 90, 97 (1st Cir. 2002)(applying harmless error review to a Court Reporter Act violation)(citations and quotations omitted). As to the Jones Act, we have reviewed these violations for plain error when they were not raised until appeal. United States v. Morales-Madera, 352 F.3d 1, 6-7 (1st Cir. 2003).

Even assuming an impairment of Geraldo's right to allocution, any such impairment was harmless. De Alba Pagan, 33 F.3d at 130 n.5. (suggesting application of the harmless error rule when "a sentence is 'already as short as it could possibly be under the Guidelines'")(quoting United States v. Carper, 24 F.3d 1157, 1162 (9th Cir. 1994)).

Nonetheless, we once again note the importance of compliance with the Jones Act. See United States v. Morales-Madera, 352 F.3d 1, 7 (1st Cir. 2003) (stating, "[p]articipants, including judges, jurors, and counsel, are entitled to understand the proceedings in English"); United States v. Rivera-Rosario, 300 F.3d 1, 5 (1st Cir. 2002).

For the reasons stated above, we **affirm** the judgment.