FILED
06/05/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2019 Session

## MARCUS WARD STRONG v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Greene County**
No. 15CR010      Alex E. Pearson, Judge

_____

### No. E2018-00286-CCA-R3-PC
_____

The Petitioner, Marcus Ward Strong, appeals the denial of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel and that his guilty pleas were unknowing and involuntary. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Keith Lowe, Knoxville, Tennessee, for the Petitioner, Marcus Ward Strong.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Cecil C. Mills, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Factual Background.** Just after noon on July 19, 2012, the Petitioner, who was driving a 1989 Ford Mustang, and the victim, Kiley Shelton, who was the unrestrained passenger in the front seat of this vehicle, were involved in a fatal wreck. The Petitioner, while negotiating a slight left curve, lost control of his vehicle, drove off the right side of the roadway, rotated counter-clockwise and crossed back across both lanes of Route 351, and then traveled more than 100 feet before striking a utility pole with the right front of his vehicle. Thereafter, Petitioner's vehicle traveled another ninety feet and rolled over two times before coming to a stop. During this wreck, the victim was ejected from the vehicle and came to a final rest entangled in nearby electrical wires, where she died from her injuries. A highway patrolman responding to the scene determined that the Petitioner, at the time of the wreck, was driving at a speed of eighty-five miles per hour in a thirty-five miles per hour zone.

The Official Alcohol Report generated by the Tennessee Bureau of Investigation (TBI) stated that the blood sample collected from the Petitioner at 3:20 p.m. on July 19, 2012, had a blood alcohol concentration (BAC) of 0.05%.

The TBI's Official Toxicology Report showed that the Petitioner's blood sample also contained the following substances:

| | |
|---|---|
| 7-Amino Clonazepam | 8.9 ng/ml |
| Nordiazepam | 211.8 ng/ml |
| Diazepam | 108.6 ng/ml |
| Dihydrocodeinone | Less than 0.05 ug/ml |
| Citalopram | Less than 0.05 ug/ml |

However, this report showed that the Petitioner's blood sample tested negative for cocaine, cannabinoids, and barbiturates.

On March 19, 2013, Dr. Kenneth E. Ferslew, the State's expert in the field of toxicology, drafted a letter after reviewing several documents relevant to this case, including the TBI's Official Alcohol Report and Official Toxicology Report. After determining that the Petitioner "would have eliminated a blood alcohol concentration of 0.045 gram%," Dr. Ferslew opined that the Petitioner's "blood alcohol concentration at the time of the crash would have been 0.095 gram%." He said that based on the Petitioner's body weight, the Petitioner would have had to consume at least "1.09 to 2.14 ounces of alcohol prior to the crash." He explained that this amount of alcohol was "equivalent to between 1.8 and 3.6, twelve ounce, 5% [alcohol] beers" and was "consistent with [the Petitioner's] statements to emergency and medical personnel that he had been drinking a few beers earlier in the day." Dr. Ferslew stated that the Petitioner's BAC "would have produced removal of inhibitions, loss of self[-]control, weakening of will power, development of feelings of well[-]being, euphoria, increased confidence, altered judgment, expansion of his personality, and dulling of attention to some extent versus a sober condition."

In this letter, Dr. Ferslew stated that 7-amino clonazepam was "an active metabolite of Klonopin (clonazepam)," which was also a "benzodiazepine used as a[n] anxiolytic, minor tranquilizer, and sedative/hypnotic." He said that the concentration of 7-amino clonazepam in the Petitioner's blood was "subtherapeutic (therapeutic 0.023 to 0.137 ug/ml) but its presence indicate[d] administration prior to the time of the crash with

- 2 -

sufficient time for biotransformation by his body." Dr. Ferslew asserted that there was "no indication of this drug being prescribed or administered to [the Petitioner] prior to the crash."

Dr. Ferslew stated, "Diazepam (Valium) is a minor tranquilizer, anxiolytic, muscle relaxant, and antiepileptic that is metabolized in the body to [N]ordiazepam (its active metabolite)." He opined that the concentrations of Diazepam and Nordiazepam, two benzodiazepines, were "within the therapeutic range for these medications (therapeutic 0.02 to 6 ug/ml, toxic 5 to 20 ug/ml, and lethal greater than 30 ug/ml). Dr. Ferslew also noted that the presence of Diazepam and Nordiazepam was "consistent with [the Petitioner's] medical history of being prescribed and taking Valium prior to the time of the crash."

Dr. Ferslew asserted that "Dihydrocodeinone (hydrocodone)" was an "opiate analgesic" and that the concentration of Dihydrocodeinone found in the Petitioner's blood was "in a subtherapeutic to therapeutic range (therapeutic 0.03 to 0.25 ug/ml, toxic 0.5 to 2 ug/ml, and lethal 0.7 to 12 ug/ml)." He noted that the "presence of this analgesic [was] consistent with [the Petitioner's] medical record which indicated that he was prescribed and had been taking Norco (hydrocodone and acetaminophen) prior to the time of the crash."

Dr. Ferslew stated that Citalopram was a "SSRI antidepressant" and that the concentration of Citalopram in the Petitioner's blood "would not have had any effect on [the Petitioner's] psychomotor performance at the time of the crash."

After evaluating the concentrations of the aforementioned substances in the Petitioner's blood sample, Dr. Ferslew provided the following conclusion:

> Though many of these other medications found in [the Petitioner's] blood at the time of the crash are from subtherapeutic to within therapeutic ranges, the combination of a significant blood alcohol concentration with these benzodiazepines and opiate can produce additive to synergistic central nervous system depression. This would cause increased psychomotor impairment to [the Petitioner] and would have contributed to his misoperation of the vehicle . . . in this fatal crash with [the victim]. [The Petitioner] was under the influence of alcohol and these drugs at the time of the crash.

- 3 -

On March 25, 2013, a Greene County Grand jury indicted the Petitioner in case number 12CR429 for aggravated vehicular homicide, vehicular homicide, violation of the habitual motor vehicle offender act, driving under the influence, and driving under the influence, seventh offense. The record indicates that at some later point, the Petitioner was charged in case number 13CR660 with two counts of conspiracy to introduce drugs into a penal institution and two counts of conspiracy to sell or deliver a controlled substance, and his parents were charged in 13CR658 and 13CR659 as co-defendants to the Petitioner's drug-related charges in case number 13CR660.

**Plea Submission Hearing**. On January 16, 2014, the Petitioner entered best interest pleas pursuant to North Carolina v. Alford, 400 U.S. 25 (1970), in case number 12CR429 to aggravated vehicular homicide, vehicular homicide, violation of the habitual motor vehicle offender act, driving under the influence, and driving under the influence, seventh offense. The Petitioner also entered guilty pleas in case number 13CR660 to two counts of conspiracy to introduce drugs into a penal institution and two counts of conspiracy to sell or deliver a controlled substance. Although this plea agreement was a package deal in which the State agreed to give the Petitioner's parents probationary sentences for their crimes, the trial court was not made aware of this package deal at the time the Petitioner entered his guilty pleas.

During the plea submission hearing, the trial court informed the Petitioner that his vehicular homicide conviction would merge with the aggravated vehicular homicide conviction and that his convictions for DUI and DUI, seventh offense, would merge with the aggravated vehicular homicide conviction.

The trial court asked the Petitioner if he was "entering this best interest plea freely and voluntarily of [his] own free will," and the Petitioner responded, "Yes, sir." The court then asked, "Any force, threats, or pressure of any kind to cause you to enter this best interest plea," and the Petitioner said, "No, sir." The court also inquired, "Anybody promise you anything other than what's on this Waiver Rights and Plea of Guilty form," and the Petitioner answered, "No, sir."

The court then detailed the terms of the Petitioner's plea agreement in case number 12CR429: "Your agreement is aggravated vehicular homicide, 18 years at 30 percent. It carries . . . 15 to 25 [years] and you're [receiving] 18 years. . . . And violation of the Habitual Motor Vehicle Offender Act is one year at 30 percent on that." The Petitioner replied that he understood that he would receive these sentences pursuant to his plea agreement.

The trial court then explained that the Petitioner would receive concurrent two-year sentences for his guilty pleas to the two counts of conspiracy to introduce drugs into

a penal institution and the two counts of conspiracy to sell or deliver a controlled substance in case number 13CR660 and that these concurrent two-year sentences would be served consecutively to the eighteen-year sentence he received in case number 12CR429, for an effective sentence of twenty years with a release eligibility of thirty percent.

The State summarized the facts supporting the aggravated vehicular homicide charge:

> On July 19[], 2012, a 1989 Mustang pulled off the lot of a convenient store/grocery store on Highway 107 here in Greene County. The vehicle was seen driving at a high rate of speed. A little over a minute later that Mustang struck a utility pole and the Mustang rolled over several times. A female, [the victim], was thrown out of the Mustang and her body was found entangled in the power lines, suspended above the roadway.
>
> The proof would be, Your Honor, that a video would have shown that . . . at the time the Mustang left that grocery store/convenience store this [Petitioner] was the driver. The proof would be that . . . the distance that the vehicle traveled was such that in a . . . minute and a few seconds, beyond a minute, we would have been able to show that [the Mustang] was traveling at an excessive rate of speed. The proof would also be not only that [the Petitioner] was driving when the vehicle left the grocery store, but he was driving at the time that it struck the utility pole. . . . [T]he toxicology report, the TBI lab report, showed that there was .05[% of] alcohol . . . in his blood . . . . The proof would be that Dr. Ferslew would have come and testified that based upon the time frame when the alcohol . . . was drawn from him and the time that had passed since the crash of the vehicle [the Petitioner's] blood alcohol level would have really been approximately .09[%]. In addition to that, a toxicology composition showed that he had clonazepam, diazepam, nordiazepam, dihydrocodeinone in his system. The proof would be, Your Honor, that at the time of the crash [the Petitioner] was a habitual motor vehicle offender.

The Petitioner acknowledged that the State had provided a fair statement of the evidence supporting his aggravated vehicular homicide charge.

The trial court accepted the Petitioner's best interest pleas in case number 12CR429 to aggravated vehicular homicide and violation of the habitual motor vehicle offender act as well to vehicular homicide, DUI, DUI, seventh offense. The court then accepted the Petitioner's guilty pleas in case number 13CR660 to two counts of

conspiracy to introduce drugs into a penal institution and two counts of conspiracy to sell or deliver a controlled substance.

**Post-Conviction.** On January 16, 2015, the Petitioner filed a petition for post-conviction relief, seeking relief only from his aggravated vehicular homicide conviction in case number 12CR429. Thereafter, the State filed its response and a motion to dismiss the petition. The Petitioner then filed an amended petition for post-conviction relief.

At the December 18, 2017 post-conviction hearing, defense counsel testified that he had been practicing law for less than three years at the time the Petitioner entered his pleas. He said that when he was retained to represent the Petitioner, he had never conducted a jury trial at the criminal court level, had never sat first chair on a Class A felony case, and had never filed an appeal. Although defense counsel said he consulted with experienced attorneys for guidance on the Petitioner's case, he could not recall whether he asked any of these experienced attorneys whether he needed to retain a "lab expert" in the Petitioner's case. However, defense counsel asserted that on September 25, 2013, he filed a motion to continue the case because he had "discovered the need to seek an expert regarding an essential element of the defendant's case and that the expert had been consulted but had not had adequate time to analyze the material provided[.]" He stated that this motion to continue was granted and that the Petitioner's trial was set for January 2014. Defense counsel could not recall if he had ever handled a case where blood alcohol testing or toxicology testing was a central issue, although he said he had handled several DUI cases in general sessions court at the time of the Petitioner's case.

Defense counsel acknowledged that the Petitioner's plea bargain was a package deal. The substance of this bargain was that if the Petitioner accepted the State's offer, then the State would ensure that the Petitioner's parents did not go to prison for their charges. Defense counsel acknowledged that the clear implication of this offer was that if the Petitioner did not plead guilty pursuant to this offer, then the State would require the Petitioner's parents to serve their sentences in prison. He said the fact that the package deal affected the Petitioner's parents "had a very big impact" on the Petitioner's decision to accept the State's offer. Prior to receiving this package deal, the State had offered the Petitioner a deal for twenty-five years and a deal for twenty-two years, but the Petitioner had not been interested in accepting those offers. Although defense counsel consistently pushed for a fifteen year deal, the State eventually offered the Petitioner the package deal involving an eighteen-year sentence for the Petitioner's guilty plea to aggravated vehicular homicide and a consecutive sentence of two years for the Petitioner's guilty pleas to the four conspiracy offenses.

Defense counsel acknowledged that the Petitioner's decision to enter a best interest plea to the package deal was based on his advice. At the time, he told the

- 6 -

Petitioner that he "felt very strongly" that the Petitioner would be convicted if they proceeded to a jury trial based on the totality of the circumstances. In particular, he noted that the Petitioner's blood sample taken just after the wreck had a BAC of .05%, and that although this was below the legal limit, the Petitioner also had Klonopin, which he had never been prescribed, in his system. Defense counsel said that he obtained the Petitioner's prescriptions and that all of the other drugs in the Petitioner's system had been prescribed to him and were below the therapeutic levels. However, he stated that the fact that the Petitioner had unprescribed Klonopin and alcohol in his system heavily influenced his belief that the Petitioner would be convicted at trial. Defense counsel admitted that if the Petitioner only had trace amounts of an inactive metabolite of Klonopin in his system that would not have caused impairment, then this would have changed how he advised the Petitioner. He also admitted that if the proof showed the Petitioner did not have citalopram or dihydrocodeinone in his system, then this also would have changed his advice to the Petitioner. Defense counsel admitted that he was not a pharmacologist or a toxicologist. Nevertheless, he insisted that "when the jury saw everything, it would have been very difficult for us to overcome what was in [the Petitioner's] system."

Defense counsel said he reviewed a law enforcement officer's report opining that the Petitioner's "alcohol and drug impairment coupled with extreme speed and the inability to properly control the vehicle . . . was the cause for this crash that claimed the life of [the victim]." He said that he discussed this report as well as Dr. Ferslew's potential testimony with the Petitioner. He also talked to the Petitioner about the video showing the Petitioner getting into the driver's seat of his car immediately prior to the accident. Defense counsel asserted that his crash reconstruction expert had also determined that the Petitioner was in the driver's seat at the time of the wreck, which eliminated the possible defense that the Petitioner was not driving and, therefore, not guilty of the charged offenses. He also interviewed witnesses who had seen the Petitioner the day of the accident and determined that they would not be helpful to the Petitioner's defense. Defense counsel said that although he had drafted a motion to suppress, he stopped drafting this motion and others when the Petitioner made the decision to accept the State's offer. Defense counsel advised the Petitioner that if convicted at trial, the trial court would likely sentence him to the top of the sentencing range in light of the fact that the victim had died and that this was the Petitioner's seventh DUI conviction.

Defense counsel said he was also influenced by a "video at the grocery store[,]" in which the Petitioner "appeared to be intoxicated" based on his "slow reactions." He admitted that this video did not have audio, which prevented him from observing whether the Petitioner had slurred speech. He also said that proof of the Petitioner's excessive speed at the time of the crash made him believe that the Petitioner would be convicted.

Defense counsel stated that a law enforcement officer's report showed that the Petitioner was driving eighty-five miles per hour in an area where the speed limit was thirty-five miles per hour. He noted that even if the Petitioner had not been intoxicated, the Petitioner's extreme recklessness, which is also a ground for vehicular homicide, caused the wreck. He admitted that vehicular homicide was only a Class B felony with a sentencing range of eight to twelve years. He also admitted that in order for the Petitioner to be convicted of aggravated vehicular homicide, to which he pled guilty, the Petitioner would have had to have been intoxicated, convicted of vehicular homicide, and then enhanced to aggravated vehicular homicide because of his prior offenses. Defense counsel felt that the Petitioner's excessive speed was "100 percent negative" because the Petitioner also had alcohol and drugs in his system.

Defense counsel was aware that the State had hired an expert, Dr. Ferslew. He noted that Dr. Ferslew's report estimated the Petitioner's blood alcohol content at the time of the crash to be over the legal limit; however, he said that this opinion did not greatly influence his advice to the Petitioner because Dr. Ferslew's estimate was "over the top" when compared to the BAC of the Petitioner's blood sample.

Defense counsel acknowledged that he never hired a "lab expert" of his own but asserted that had the Petitioner proceeded to a jury trial, he felt "confident that we would have hired a lab expert because we would have had no other way to dispute their evidence." He said he did not feel that retaining a toxicologist would have helped the Petitioner's case because the State had some witnesses who could testify "about what [the Petitioner] was doing [the] morning [of the wreck]." However, he admitted that if the testimony from these witnesses had been in conflict with the substances found in the Petitioner's blood sample, then this would have been helpful to the defense. Looking at it in "hindsight," defense counsel said "it seem[ed] as though [a lab expert] could have had an opinion that would have assisted us." He acknowledged that having his own lab expert would have been the only way to know if the State's expert was wrong.

When post-conviction counsel candidly asked defense counsel if he now believed he should have hired a toxicologist in the Petitioner's case, defense counsel replied:

> At the time that I was looking at the discovery and everything that I was looking at as far as this case, I do not believe that I had to hire a toxicologist or I should have. Looking at it now, again hindsight [is] 20/20, I think the answer would be, yes, [I] should have hired an expert.

However, defense counsel said that in light of what a witness had said "[the Petitioner] was doing that morning" of the wreck, he would have seriously questioned an expert's testimony that the Petitioner only had the inactive metabolite of Klonopin in his system, which would not have impaired him.

Defense counsel said that he was not aware that some of the "spectra" that the TBI identified as certain substances were actually extremely poor matches for the substances they claimed them to be and that as a defense attorney, he would have been interested in this information. He stated that he looked into independently testing the blood but that the TBI had already destroyed the Petitioner's blood sample by that time. Defense counsel acknowledged that he never filed a motion to dismiss the case pursuant to State v. Merriman, 410 S.W.3d 779 (Tenn. 2013) and never filed a motion to suppress the TBI lab report pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), based on the State's failure to preserve material evidence. Nevertheless, he asserted that he was working on a motion to suppress the Petitioner's statements and blood when the Petitioner decided to accept the package plea agreement. Defense counsel did not recall advising the Petitioner about filing a motion to dismiss or suppress.

Defense counsel said the Petitioner pled guilty to each count with which he was charged and was sentenced as a Range I offender. He acknowledged that the Petitioner did not plead to a reduced sentencing range. He also conceded that the Petitioner did not enter guilty pleas to offenses of a lower classification than the offenses with which he was charged and did not receive a sentence at the bottom of the range for his Class A felony, the aggravated vehicular homicide offense. Defense counsel also acknowledged the Petitioner pled guilty to several felony conspiracy charges that occurred over the same time period. He said he was not aware that there was a strong statutory argument, pursuant to Tennessee Code Annotated section 39-12-103, that the Petitioner could only be convicted of one count of conspiracy because the multiple offenses were the object of one conspiratorial agreement.

Defense counsel acknowledged that all material terms should be announced during the plea colloquy and that the material terms regarding the State's promise not to incarcerate the Petitioner's parents were not disclosed to the trial court. When post-conviction counsel asked defense counsel if there was a reason he did not inform the trial court that the Petitioner's guilty plea was a package deal, defense counsel replied that he did not believe "there was a reason behind it" and that he could only "affirmatively state . . . that the court was not made aware that it was a package deal" involving the Petitioner's parents' cases. He acknowledged that when the court asked if any other promises or threats had been made to the Petitioner during the plea submission hearing, the Petitioner responded, "No," and he should have informed the court that the package deal included a promise that the Petitioner's parents would not be incarcerated. Defense

counsel said that at the time, he did not "think anything of" the fact that the State's promise regarding a non-incarcerative sentence for the Petitioner's parents was not mentioned.

Defense counsel explained that when the State originally made the package offer, it said only that the Petitioner's parents would be taken care of, which defense counsel and the Petitioner interpreted to mean that the Petitioner's parents' cases would be dismissed, and the Petitioner accepted the State's offer. However, immediately prior to entry of the plea, the State informed defense counsel that it was not going to dismiss the cases against the Petitioner's parents but would not require the parents to be imprisoned. Defense counsel said he explained this change to the Petitioner before the Petitioner entered his guilty pleas. He stated that based on everything he remembered about the case and based on the totality of the circumstances involved, he would have provided the same advice to the Petitioner regarding the package plea agreement.

Defense counsel stated that although the Petitioner entered a guilty plea on January 16, 2014, the Petitioner's trial was set for some time later in January 2014. He said that the Petitioner was aware that he had not hired a toxicologist/pharmacologist within ten days of the Petitioner's trial. However, he asserted that if the State had not offered the Petitioner a plea deal at that point in time, he would have asked for a continuance so he could prepare for trial. Defense counsel conceded that motions for continuances were not always granted and that there was some possibility that he might have had to go to trial on January 24, 2014. However, he asserted that he would have obtained a toxicologist within that limited amount of time. Although defense counsel later admitted that there was no guarantee that he would have been able to pay and prepare a toxicologist/pharmacologist within ten days of trial; he maintained that he would have done everything he could to have an expert at the Petitioner's trial. Defense counsel acknowledged that he ran the risk of having his expert excluded by not disclosing his intent to call the expert sooner. He also admitted that he had never had to hire a toxicologist in any of his previous cases.

Dr. Jimmie Valentine testified that he had earned his master's degree and Ph.D. in medicinal chemistry, that he had taught pharmacology in several medical schools to medical students and physician residents, and that he had directed and worked in the toxicology laboratories in all the medical schools in which he taught. Dr. Valentine was accepted as an expert in the areas of clinical pharmacology and toxicology as well as laboratory science, blood testing, and the sciences of liquid chromatography, gas chromatography, and mass spectrometry.

Dr. Valentine noted that the TBI lab found several drugs in the Petitioner's blood sample as well as some metabolites of drugs. He said the TBI specifically found the drug

Citalopram, which is an antidepressant drug, and the drug Diazepam, whose tradename is Valium. He said the TBI also found metabolites of Diazepam, which is Nordiazepam. In addition, he noted that the TBI found Hydrocodeinone, which is generally referred to as Hydrocodone and is a prescription medication that is used as an analgesic.

Dr. Valentine said that the Petitioner's elevated blood sugar did not necessarily mean that extra alcohol was produced in his blood sample but stated that it was a possibility. He noted that approximately two and a half hours elapsed between the time the Petitioner was driving and the time the Petitioner's blood was drawn. In addition, he asserted that there was no way to know whether the Petitioner's blood alcohol level was going up or down at the time of the accident by looking at the test result. Dr. Valentine said Dr. Ferslew made the assumption that the Petitioner was in the post-absorbant phase of alcohol before concluding that the Petitioner's BAC was .095% at the time of the wreck. However, Dr. Valentine insisted that there was no way for him or Dr. Ferslew to know that the Petitioner was in the post-absorbant phase based on the information they were given and that Dr. Ferslew's assumption regarding this phase could be incorrect. Dr. Valentine agreed with the opinion of A.W. Jones, a world renowned scientist, who asserted in the standard reference text Garriott's Medicolegal Aspects of Alcohol that attempts to back-extrapolate a suspect's blood alcohol from the time of the sampling to the time of driving is "a dubious practice involving too many variables and unknowns[.]"

When asked if it was possible that the Petitioner, at the time of driving, could have had a BAC of less than .095%, Dr. Valentine replied:

> Well, what happens is that if you try to estimate somebody's blood alcohol level at a prior time, you stand the danger of overestimating what the level was. Particularly if you don't know what has been happening in that individual in that period of time. So what we know is that we had an individual in this case [who] was injured in an accident, he suffered some serious injuries, he's obtained a lot of medical intervention before this blood sample is ever drawn from him. And so, all of those things are going to affect how this alcohol is being metabolized in his body, being handled. So trying to back it up and say exactly what the level was, is I think is, using Dr. Jones's word, would be dubious.

Dr. Valentine said that he would not even attempt to back-extrapolate the Petitioner's BAC at the time of driving because there are "so many unknowns" and "you have to make so many assumptions" that "you can't get a good meaningful number[,]" and "[i]t's just a wild guess." He stated that it would have been possible for the Petitioner to be under the legal limit at the time of driving and that he would have felt comfortable

testifying to a jury that it should not rely on the .095% that Dr. Ferslew concluded was the Petitioner's BAC at the time he was driving.

Dr. Valentine stated that there were four variables that must be considered when determining peak blood level: (1) what beverage the person was drinking, (2) what time the person drank, (3) when the last drink was taken, and (4) how much food was in the person's stomach. He noted that Dr. Ferslew's report did not mention any of these variables and only took the amount of time and multiplied it by .017, which is Widmark's beta factor that represents the rate at which a woman would eliminate alcohol. He said that if you were to engage in the dubious practice of doing a retrograde extrapolation of the Petitioner's BAC, then it would be appropriate to use a range of values or an elimination rate recommended by Dr. A.W. Jones of .008 grams per deciliter for the elimination rate, and that if you did this, then the Petitioner at the time he was driving would have a BAC of .071%, which is under the legal limit. Dr. Valentine also said that because the Petitioner suffered a laceration to his liver during the accident, this injury could have slowed down the metabolism of alcohol, which potentially could have made the Petitioner's BAC closer to .05% at the time of driving. He also said that the saline IV administered to the Petitioner could have affected his BAC.

Dr. Valentine asserted that the drug Klonopin, an anxiety medication, was not found in the Petitioner's blood sample. Instead, 7-aminoclonazepam, which is a metabolite of Klonopin, was found in the Petitioner's system. Dr. Valentine opined that 7-aminoclonazepam is much weaker than the parent drug, Klonopin and that the 8.9 nanograms per milliliter found in the Petitioner's system would not have impaired the Petitioner's ability to drive. He also opined that 7-aminoclonazepam, when combined with alcohol, would not have impaired the Petitioner's ability to drive.

Dr. Valentine said that the amount of Diazepam in the Petitioner's system, which was at the very low end of the therapeutic range, did not suggest that it impaired the Petitioner's ability to drive because the Petitioner's medical records indicated that the Petitioner had been taking this drug for some time and would have been tolerant to the initial side effects that would affect driving performance. He acknowledged that the Diazepam could have an impairing effect in the first two weeks of taking it and that although the hospital had verified that the Petitioner had a prescription for Diazepam, he did not know how long the Petitioner had been taking it. He asserted that if he had been hired to assist in defending the Petitioner, he would have opined that there was true doubt about whether the Petitioner was impaired at the time he drove in this case based on the alcohol and toxicology reports submitted by the TBI.

Dr. Valentine also stated that the TBI lab reported only trace amounts of Citalopram, an antidepressant, and Dihydrocodeinone, also known as Hydrocodone, and

that both of these drugs were present in such low amounts that they would not have impaired the Petitioner's ability to drive. Dr. Valentine said that the drug the TBI claimed to be Citalopram did not have a sufficient match to call it Citalopram and that he believed this drug was not actually Citalopram. He also noted that the drug the TBI claimed to be Dihydrocodeinone was an "extremely poor match" for Dihydrocodeinone and that he would not be comfortable calling it Dihydrocodeinone.

Dr. Valentine also noted that the TBI found that the Petitioner had nicotine and caffeine in his system. He said that the records indicated that the Petitioner had more caffeine in his system than drugs and that because caffeine is a central nervous system stimulant, it would offset some of the effects of alcohol and would suppress any other depressant drugs that the Petitioner had taken.

Dr. Valentine acknowledged that the Widmark formula is widely used in the forensic community to conduct a retrograde extrapolation of the Petitioner's BAC at the time he was driving. He admitted that if you used .015, which is the average rate at which males eliminate alcohol from the body, then the Petitioner would have a BAC at the time of driving of .089%, which was over the legal limit. He noted that Dr. Ferslew used .017, which was the average rate at which females eliminate alcohol from the body, and was able to calculate the Petitioner's BAC at time of driving to be .095%.

The Petitioner also testified in his own behalf. He stated that defense counsel told him he was very concerned about the Klonopin found in his system. He said that he knew now, based on Dr. Valentine's testimony, that there was no Klonopin in his system, and that if he had been aware of that information, he never would have entered into the package plea agreement. The Petitioner asserted that defense counsel never told him that Dr. Ferslew's opinion could be attacked or that Dr. Ferslew's conclusions might not be sound. He also said that at the time he entered his guilty plea, he was not aware that the results from his blood test could be challenged. He also said that if he had known that retrograde extrapolation was an imprecise science or half of the other things to which Dr. Valentine testified, he would not have entered his guilty pleas. The Petitioner maintained that he entered a best interest plea because he did not feel comfortable pleading guilty to the charged offenses.

The Petitioner stated that as a part of the package plea agreement, the State promised that his parents would not be imprisoned for their charges. He said that he initially believed that his parents' charges would be dismissed as a part of this agreement but later learned that his parents would only receive probation. The Petitioner said he never told the trial court about the State's promise that his parents would receive probation because he was afraid that "they would throw the whole deal out." He asserted that having his parents avoid prison was a "very big" factor for him, which was why he

did not disclose it to the trial court during his plea submission hearing, and that if he had not pled guilty, then his parents would have been at risk for imprisonment. He stated that the threat of his parents' incarceration coerced him into entering his plea, even though he did not feel comfortable with it.

The Petitioner said that defense counsel informed him that there was "no way [he] was going to win" his case and that the best option was to get the "best plea possible." He stated that the threat of his parents going to prison and defense counsel's claim that he did not have a defense made him decide to enter his guilty pleas.

The Petitioner acknowledged that he originally hired defense counsel because he had heard that he was "willing to fight for you and . . . was a good attorney." He added that defense counsel had a good reputation despite the fact that he had only been practicing for a few years. Nevertheless, he said defense counsel acted like he was "fighting a losing battle" in his case. The Petitioner acknowledged that if a jury had heard the last paragraph of Dr. Ferslew's report, it would have been devastating to his case.

The Petitioner acknowledged that at the beginning of his case, he was unsure that he was driving at the time of the wreck. He conceded that defense counsel fought against the State's claim that he was the driver for six months. The Petitioner also acknowledged that the State had to obtain a video showing him getting into the driver's seat of his car immediately prior to the wreck before he finally admitted that he was the driver. He also said defense counsel discovered what witness Rachel Carrier had observed shortly before the wreck and admitted that Carrier's testimony would not have been helpful to his case.

The Petitioner admitted that the State had 120 hours of recorded telephone conversations between him and his parents during his imprisonment, wherein he discussed obtaining some Diazepam while incarcerated. However, he asserted that he "wasn't in [his] right mind" at the time of these conversations. The Petitioner acknowledged that he got involved in a large scheme to get drugs inside the prison but claimed that he was just trying to obtain drugs for himself.

The Petitioner admitted that on the day of the wreck, he was not supposed to be driving because he did not have a valid driver's license. He also admitted that he had been drinking prior to the wreck, although he claimed that he only consumed one glass of alcohol. He also said he was driving fast the day of the wreck in order to get the victim to work. The Petitioner asserted he had been taking Diazepam, otherwise known as Valium, for at least two months at the time of the wreck and that he had been prescribed this medication.

- 14 -

The Petitioner admitted that when the trial court asked him during his plea submission hearing if anyone had promised him anything other than what was contained in his guilty plea form, he responded, "No, sir." He also admitted when he entered the pleas in this case, he had already entered guilty pleas in several prior criminal cases and had gone through similar plea colloquies. Although the Petitioner acknowledged telling the trial court during the plea submission hearing that he was satisfied with defense counsel's assistance, he said he was being dishonest when he made that statement.

On January 22, 2018, the trial court entered a written order denying the Petitioner's post-conviction petition. On the issue of whether defense counsel's performance was deficient under Strickland, the post-conviction court made the following findings of fact and conclusions of law:

> [Defense counsel] developed a trial strategy based on what [the Petitioner] told him as well as what [the Petitioner] told law enforcement and worked under that theory until new evidence developed rendering that strategy no longer viable. [Defense counsel] interviewed potential witnesses during his investigation of the case and could not turn up any that would be favorable. [Defense counsel] went over all the discovery with the [Petitioner] and tried to negotiate the best plea offer he could for [the Petitioner]. [Defense counsel] hired a crash reconstruction expert and that turned out not to help the defense's case. The Court finds that the [Petitioner] has failed to overcome the presumption that [defense counsel's] conduct falls within the range of competence demanded of attorneys in criminal cases. The Court agrees that it could have been useful if [defense counsel] had been able to have the information that Dr. Valentine provided but finds that the information is far from conclusive and questionable in some regards; furthermore, a defendant is not entitled to perfect or the best representation but only effective representation under prevailing professional norms. The Court cannot find that [defense counsel] failed to meet that standard under the facts of this case. "In reviewing counsel's conduct, we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." [See] Howell[, 185 S.W.3d] at 326 and Strickland, 466 U.S. at 689, 104 S. Ct. 2052.

Regarding whether defense counsel's alleged deficiencies resulted in prejudice to the Petitioner, the post-conviction court made the following findings and conclusions:

- 15 -

The second consideration of the Strickland analysis is the prejudice prong. This Court finds that even if [defense counsel] was deficient in failing to procure an expert in the fields of pharmacology and toxicology that said failure did not prejudice the [Petitioner]. The testimony the Court heard from Dr. Valentine on cross-examination established that the [Petitioner] would be over the limit under the extrapolation analysis under all but the most [Petitioner]-friendly elimination factors. The Court cannot find "that there is a reasonable probability that, but for counsel's error, [the Petitioner] would not have pleaded guilty and would have insisted on going to trial." See Howell v. State, 185 S.W.3d 319 (Tenn. 2006). Furthermore, if the Court accepts [defense counsel's] testimony that keeping his parents out of jail was a powerful motivator in his plea, then there is no basis to assume that same consideration would not have been present if the [Petitioner] had knowledge of Dr. Valentine's opinion. The last issue raised by Dr. Valentine's testimony centers around blood alcohol elimination being affected by the liver injury. The Court finds that the [Petitioner's] blood alcohol level would be at least the amount reported by the TBI lab and that in conjunction with the controlled substances in the [Petitioner's] system still could lead a jury to accept that the [Petitioner] was intoxicated under the law without the higher extrapolated results. [Defense counsel] testified that he did not accept the extrapolation number generated by the State's expert but thought the jury would convict anyway based on the alcohol level reported by the TBI lab in conjunction with the presences of the controlled substances in the [Petitioner's] system; therefore, the injury to the [Petitioner's] liver would not have served to change [defense counsel's] advice to his client because he believed guilt would have been established by the combination of substances without the extrapolated alcohol number.

Finally, as to whether the Petitioner's plea was unknowing and involuntary, the post-conviction court made these findings and conclusions:

This Court has also been asked to find that [the Petitioner] is entitled to a new trial because a material component of the plea agreement was not disclosed to the trial court and thus was not sufficiently explored by the trial court to determine whether the [Petitioner] was knowingly and voluntarily entering his guilty plea. The Court has reviewed the trial court's plea colloquy and finds that the original trial judge asked all the necessary questions to determine if the [Petitioner] was knowingly and voluntarily entering his guilty plea. The Court finds that the prosecution was acting in good faith and had probable cause to charge the [Petitioner's]

- 16 -

parents and did not improperly coerce the [Petitioner] into entering a guilty plea. The original trial court questioned [the Petitioner] to determine if he had received any force, threats, or pressure to plead guilty. [The Petitioner] indicated to the trial judge that he had not received any such coercion. [The Petitioner] also said in the guilty plea hearing that [defense counsel] adequately investigated the case and interviewed the witnesses he wanted and did the things he wanted. [The Petitioner] further agreed that [defense counsel] did everything he wanted him to do and that he would not be coming back later saying that he failed to do something. [The Petitioner] agreed he was perfectly satisfied with [defense counsel's] representation. The current [post-conviction] team argues that failing to disclose the agreement for probation for [the Petitioner's] parents prevented the trial court from fully determining whether the [Petitioner's] plea was knowingly and voluntarily entered. [Defense counsel] and the District Attorney's Office both acknowledged that this agreement did exist and that the failure to disclose it was merely an oversight; furthermore, there is absolutely no indication that the [Petitioner's] parents failed to receive the benefit that was promised. [The Petitioner] acknowledged that there were numerous recorded jail phone calls that were strong evidence in the conspiracy case. Moreover, this Court finds it suspicious that [the Petitioner's] parents received the benefit of the bargain and received the probation promised to them and that [the Petitioner] now wants to use said agreement to obtain further benefit to himself now that his parents' judgments are entered. This Court finds that the original trial judge had all the information needed and that the [Petitioner] did knowingly and voluntarily enter his guilty pleas. The Court further notes the [Petitioner's] extensive criminal history and familiarity with the criminal justice system eliminates the concern of a situation of a defendant who is confused or who does not otherwise understand the nature and consequences of the decisions he is making. This [Petitioner] was well-equipped to understand the nature of the plea bargaining process and the consequences thereof. The Court finds that this familiarity weighs heavily in favor of concluding that the [Petitioner] knowingly and voluntarily accepted the State's offer and ple[d] guilty.

Following entry of this order, the Petitioner filed a timely notice of appeal.

## ANALYSIS

The Petitioner contends that defense counsel rendered ineffective assistance in failing to adequately investigate his case and in failing to retain an expert witness. He also argues that counsel's ineffectiveness and the non-disclosure of his package plea

agreement to the trial court rendered his guilty plea involuntary and unknowing. In response, the State asserts that the defense counsel was effective and that the Petitioner's plea was knowingly and voluntarily entered. We agree with the State and conclude that the Petitioner is not entitled to relief.

**I. Ineffective Assistance of Counsel.** The Petitioner argues that defense counsel was ineffective in failing to retain an expert witness to rebut Dr. Ferslew's opinions, in failing to retain an expert to review and explain the contents of the TBI's toxicology report, and in failing to conduct a proper investigation even in the absence of an expert. He claims that the seriousness of his aggravated vehicular homicide charge magnified defense counsel's aforementioned deficiencies. The Petitioner also asserts that but for counsel's deficient performance, he would have insisted on going to trial.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). A petitioner successfully demonstrates deficient performance when the clear and

- 18 -

convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). To satisfy the "prejudice" requirement in the context of a guilty plea, the petitioner must show that, but for counsel's errors, he would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

First, the Petitioner argues that defense counsel was deficient in failing to retain an expert to rebut the opinion of the State's expert, Dr. Ferslew. He notes that Dr. Ferslew's opinion that the Petitioner's blood alcohol level was above the legal limit created a presumption that the Petitioner was driving under the influence at the time of the accident, which is one of the elements of vehicular homicide. See T.C.A. §§ 39-13-218(a)(1)(A); 39-13-213(a)(2); 55-10-411(a). He claims that because Dr. Ferslew's opinion provided enough evidence for the Petitioner to be convicted of aggravated vehicular homicide, defense counsel should have retained a similar expert to rebut Dr. Ferslew's conclusions.

Second, the Petitioner contends that defense counsel was deficient in failing to retain an expert for the purpose of fully understanding the contents of the TBI toxicology report. He asserts that defense counsel erroneously believed, based on his interpretation of this report, that the Petitioner's blood contained the drug Klonopin, which affected how defense counsel advised him and how he evaluated the chances of success at trial.

When considering whether defense counsel was deficient, the post-conviction court found that "[defense counsel] developed a trial strategy based on what [the Petitioner] told him as well as what [the Petitioner] told law enforcement" and then "worked under that theory until new evidence developed rendering that strategy no longer viable." The court noted that although defense counsel hired a crash reconstruction expert to provide support for the Petitioner's claim that he was not driving at the time of the wreck, this expert was not helpful to the Petitioner's case. The court also stated that although defense counsel interviewed potential witnesses during his investigation, none of these witnesses were favorable to the Petitioner's case. The court then found that defense counsel tried to negotiate the best plea offer he could for the Petitioner. Although the court acknowledged that "it could have been useful if [defense counsel] had been able to have the information that Dr. Valentine provided," it nevertheless found that Dr. Valentine's "information [was] far from conclusive and [was] questionable in some regards." The court then held that defense counsel had not provided deficient representation under prevailing professional norms.

- 19 -

We recognize that in light of the testimony provided by Dr. Valentine, the issue of whether defense counsel provided deficient performance is a fairly close question. In evaluating whether counsel's representation fell below the prevailing professional norms, we reiterate that a criminal defendant is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. 1996). Accordingly, the question, under Strickland's deficient performance prong, is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. 86, 105 (2011) (quoting Strickland, 466 U.S. at 690). In evaluating an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

In Harrington v. Richter, 562 U.S. at 106, the United States Supreme Court provided guidance for determining whether an attorney's failure to retain an expert constitutes deficient performance:

> Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." [Strickland, 466 U.S. at 689]. Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. [Id.] It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.

The Harrington court recognized that counsel are entitled to "formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Id. at 107 (citing Knowles v. Mirzayance, 556 U.S. 111, 125-26

(2009); Rompilla v. Beard, 545 U.S. 374, 383 (2005); Wiggins v. Smith, 539 U.S. 510, 525 (2003); Strickland, 466 U.S. at 699)).  It also concluded that "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation."  Id. at 111.

Here, the record does not preponderate against the post-conviction court's findings that defense counsel developed a trial strategy based on the Petitioner's statements to him that he was not driving and to law enforcement and then worked under that defense theory until new proof rendered that strategy impossible.  We also agree that defense counsel hired a crash reconstruction expert, who opined that the Petitioner was the driver at the time of the wreck, was unable to find any witnesses beneficial to the Petitioner's case, and then negotiated a favorable plea agreement that not only allowed the Petitioner to receive a shorter sentence than he faced if convicted at trial but also allowed the Petitioner's parents to avoid incarceration.  We believe such performance constitutes "active and capable advocacy."  Id.

We also recognize that "[i]n most cases . . . the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that Strickland v. Washington shields from scrutiny."  Kendrick v. State, 454 S.W.3d 450, 475 (Tenn. 2015).  In our view, the Petitioner's case did not "hinge on expert forensic science testimony."  Id.; cf. Gersten v. Senkowski, 426 F.3d 588, 607-11 (2d Cir. 2005) (stating that defense counsel's failure "to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse" was deficient because "[t]he prosecution's entire case rested on the credibility of the alleged victim's testimony"); Driscoll v. Delo, 71 F.3d 701, 709 (8th Cir. 1995) ("Whether or not the alleged murder weapon—which was unquestionably linked to the defendant—had blood matching the victim's constituted an issue of the utmost importance" and "[u]nder these circumstances, a reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results.").  Other than Dr. Ferslew's testimony and the TBI reports showing the presence of alcohol and drugs in the Petitioner's system, there was substantial inculpatory proof present in this case—the video recording taken immediately prior to the accident indicated the Petitioner's impairment based on the Petitioner's "slow reactions," the statements from law enforcement officers and eyewitnesses regarding the Petitioner's excessive speed at the time of the wreck as well as horrible circumstances surrounding the wreck, the statements from emergency medical professional about the Petitioner's incriminating behavior, demeanor, and statements made immediately following the wreck, and the Petitioner's own damaging statement to police, even though this statement fell short of a confession.  See Kendrick, 454 S.W.3d at 477 (concluding that this case did not hinge on expert testimony because "the bulk of the State's case consisted of eyewitnesses").

- 21 -

While we agree that it might have been advantageous for defense counsel to have the information provided by Dr. Valentine at the post-conviction hearing, we do not feel, under the circumstances in this particular case, that defense counsel's failure to retain such an expert fell outside the wide range of reasonable professional assistance. Defense counsel knew that the Petitioner had consumed <u>both</u> alcohol and drugs prior to this horrific and deadly wreck. <u>See</u> <u>Strickland</u>, 466 U.S. at 691 (permitting counsel to "make a reasonable decision that makes particular investigations unnecessary"). Burdened with this and other overwhelmingly inculpatory evidence in this case, it was reasonable for him to conclude that no further investigation into the science behind the TBI's official reports was necessary. <u>See</u> <u>Harrington</u>, 562 U.S. at 110 (noting that "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities"). While it may have been "best practices" for defense counsel to consult with a toxicologist expert, we conclude that counsel's failure to do so in this case was "not objectively unreasonable." <u>Kendrick</u>, 454 S.W.3d at 477 (citing <u>Harrington</u>, 562 U.S. at 106). For all these reasons, we conclude that the Petitioner has failed to demonstrate that defense counsel was deficient in failing to retain an expert in this case.

The Petitioner also claims that even if defense counsel did not hire an expert, he was deficient in failing to investigate and conduct any necessary research on whether the Petitioner was impaired at the time of the accident in order to adequately defend him. He asserts that had defense counsel performed an adequate investigation on his own, he could have argued that the Petitioner was not under the influence at the time of the accident. As we previously explained, the undisputed evidence established that the Petitioner consumed both alcohol and drugs prior to the wreck, which raised the strong inference that the Petitioner was impaired when the wreck occurred. In light of this evidence as well as other incriminating evidence apparent from the record, we conclude that defense counsel's failure to conduct further research regarding whether the Petitioner was impaired was not deficient.

Lastly, the Petitioner contends that he was prejudiced by defense counsel's alleged deficiencies. He claims that if defense counsel had adequately researched the case on his own or had retained an expert to rebut Dr. Ferslew's conclusions, defense counsel would have most likely changed his recommendation to accept the plea agreement, and the Petitioner would have insisted on going to trial. Citing <u>State v. Black</u>, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990), the Petitioner asserts that he conclusively established that counsel's errors prejudiced him when he presented the testimony of Dr. Valentine, an expert who could have been found by reasonable investigation and who would have testified favorably in support of his defense. The Petitioner also contends that his plea agreement was not better than he would have fared at trial if convicted of all the charged

offenses because any convictions for vehicular homicide and DUI would have merged with the aggravated vehicular homicide conviction. The Petitioner asserts that "because [he] had little to lose by going to trial, the probability that [he] would have insisted on going to trial had he had an expert witness seems reasonable."

We conclude that the Petitioner has failed to show that but for counsel's alleged errors, he would not have entered his guilty pleas and would have proceeded to trial. While Dr. Valentine's testimony at the post-conviction hearing was somewhat compelling, it was not unassailable. The reality in this case was that the Petitioner's blood sample contained not only a BAC of 0.05% but also at least four different drugs that functioned as a tranquilizer, a muscle relaxant, an analgesic (painkiller), and an antidepressant. Moreover, as aptly noted by the post-conviction court, Dr. Valentine's admissions on cross-examination "established that the [Petitioner] would be over the [legal] limit under the extrapolation analysis under all but the most [Petitioner]-friendly elimination factors." Given the undisputed evidence that the Petitioner consumed alcohol along with an assortment of drugs prior to the wreck as well as the other incriminating proof present in this the record, it strains reason to conclude that a rational jury would not have found the Petitioner guilty of aggravated vehicular homicide beyond a reasonable doubt. See Hill, 474 U.S. at 59 (stating that "the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea," and this assessment "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial"). We also recognize that because the State possessed overwhelming evidence that both the Petitioner and his parents had committed the conspiracy counts, a rational jury would have found them guilty of these counts as well. All of this proof, along with the horrific evidence that the victim was ejected from the car and died at the scene after becoming entangled in electric wires leads us to conclude that the Petitioner made a voluntary and intelligent choice to enter his pleas because he believed, quite reasonably, that he would be convicted of the charged offenses at trial.

In addition, we must consider the fact that the package guilty plea contained the State's attractive promise that the Petitioner's parents would not be imprisoned for their crimes. Because there is no indication in the record that the Petitioner's parents failed to receive the benefit of that bargain, we find it extremely disconcerting that Petitioner now seeks to use the package plea agreement that assisted his parents as a way to dismantle his own guilty pleas.

Finally, we recognize that had the Petitioner been convicted of the charged offenses at trial, he would have faced a sentence of fifteen to twenty-five years for the aggravated vehicular homicide charge, two to four years for the each count of conspiracy

- 23 -

to introduce drugs into a penal institution, and one to two years for each count of conspiracy to sell or deliver a controlled substance. While the Petitioner could have received an effective thirty-seven-year sentence if convicted of all offenses and the trial court imposed consecutive sentencing, the Petitioner pursuant to this package plea agreement only received an effective sentence of twenty years. Accordingly, we feel confident in concluding that the Petitioner has failed to establish any prejudice from defense counsel's alleged deficiencies.

**II. Involuntary and Unknowing Plea.** The Petitioner also contends that both the non-disclosure of his package plea agreement to the trial court and defense counsel's aforementioned ineffectiveness rendered his guilty plea involuntary and unknowing. Because we have already concluded that defense counsel provided effective assistance in this case, the Petitioner is not entitled to relief from his guilty pleas on this basis. However, we will now consider whether the non-disclosure of the package plea agreement caused the Petitioner to enter an involuntary and unknowing plea.

The validity of a guilty plea is a mixed question of law and fact that is reviewed de novo. Lane, 316 S.W.3d at 562. An individual may waive his constitutional rights and enter a guilty plea. Bush v. State, 428 S.W.3d 1, 9 (Tenn. 2014). However, in order to be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. Lane, 316 S.W.3d at 562 (citing State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977); Alford, 400 U.S. at 31; Brady v. United States, 397 U.S. 742, 747 (1970); Boykin v. Alabama, 395 U.S. 238, 242-44 (1969)). Waiver of an individual's constitutional rights cannot be presumed and must be apparent from the record. Ward v. State, 315 S.W.3d 461, 465 (Tenn. 2010).

"'[T]he record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea[.]'" State v. Mellon, 118 S.W.3d 340, 345 (Tenn. 2003) (quoting Mackey, 553 S.W.2d at 340); see Tenn. R. Crim. P. 11(b)(1). When determining whether a guilty plea was knowingly, voluntarily, and intelligently entered, the court must consider "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Lane, 316 S.W.3d at 562 (quoting Grindstaff, 297 S.W.3d at 218). If a guilty plea is not knowingly, voluntarily, and intelligently entered, then the defendant has been denied due process, and the guilty plea is void. Id. (citations omitted).

"[T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). This is because "[s]olemn declarations in open court carry a

strong presumption of verity[.]" Id. at 74. Because such statements carry a strong presumption of truthfulness, a petitioner, in order to overcome this presumption, must present more than "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible." Id.

A plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats[.]'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). In determining whether a guilty plea is voluntarily and intelligently entered, a trial court must look at a number of factors, which include the following:

> 1) the defendant's relative intelligence; 2) the defendant's familiarity with criminal proceedings; 3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; 4) the advice of counsel and the court about the charges and the penalty to be imposed; and 5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial.

Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006) (citing Blankenship, 858 S.W.2d at 904).

The Petitioner argues that the non-disclosure of his package plea agreement rendered his guilty plea involuntary and unknowing because the State's promise of sentencing leniency for his parents was a material term in his own agreement. He claims that this term, which affected whether his parents would be required to serve their sentences in prison, was "one that could overbear the will of the accused and cause an innocent person to plea[d] guilty." Moreover, citing United States v. Abbott, 241 F.3d 29, 33 (1st Cir. 2001), the Petitioner asserts that this court should be particularly concerned that his plea was not knowing and voluntary because he "maintained his innocence through a best interest plea" and because "[defense] counsel's investigation and advice may have led him to believe that the case against him was sound even though it was not."

A plea agreement is considered a "wired" or "package" plea agreement when the prosecution conditions acceptance of one defendant's plea agreement on another defendant's willingness to accept a plea agreement. Howell, 185 S.W.3d at 333 (citing United States v. Hodge, 412 F.3d 479, 489 (3d Cir. 2005); United States v. Gamble, 327 F.3d 662, 664 n.4 (8th Cir. 2003)). The United States Supreme Court held that "[d]efendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation." Bordenkircher v. Hayes, 434 U.S.

357, 363 (1978). Although confronting a defendant with the risk of harsher punishment may discourage him from asserting his trial rights, the imposition of these difficult choices upon a defendant is "'an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" Id. at 364 (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973)).

In Howell v. State, 185 S.W.3d at 333, the Tennessee Supreme Court considered whether the practice of offering package plea agreements was so coercive that it rendered the subsequent guilty plea involuntary. The court noted that this practice becomes coercive when it "creates improper pressure that likely would overbear the will of innocent people causing them to plead guilty." Id. at 333-34 (citing United States v. Pollard, 959 F.2d 1011, 1021 (D.C. Cir. 1992)). The court, embracing the stance taken by the majority of jurisdictions, concluded that package plea agreements were not invalid per se. Id. at 334.

After reaching this conclusion, the Howell court reiterated the United States Supreme Court's concern in Bordenkircher that package plea agreements "'might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks that a defendant must consider.'" Id. (quoting Bordenkircher, 434 U.S. at 364 n.8). The court also recognized that "[p]ackage plea agreements also present an opportunity for a defendant to manipulate the system" because "[a] defendant who has obtained a benefit for a co-defendant may move to withdraw his own plea after the co-defendant has received the benefit." Id. (citing United States v. Mescual-Cruz, 387 F.3d 1, 8 (1st Cir. 2004)); State v. Bey, 17 P.3d 322, 332 (Kan. 2001) (noting that disclosure of terms involving leniency to a third party "would [not only] preclude a defendant from taking advantage of the plea agreement and then seeking to nullify a part of its terms by seeking to withdraw his or her plea after the third party's plea has been accepted" and but also "head off any dispute as to exactly what the term was and whether the State had complied with the term"). Because of the risks involved, the court concluded that specific safeguards should be utilized in cases involving package plea agreements. Id.

First, the Howell court held that "[i]n cases involving leniency toward a third party or a promise not to prosecute a third party, the prosecution must act in good faith." Id. at 335 (citing Gamble, 327 F.3d at 664; Miles v. Dorsey, 61 F.3d 1459, 1468 (10th Cir. 1995); Politte v. United States, 852 F.2d 924, 929-30 (7th Cir. 1988); Stinson v. State, 839 So.2d 906, 909 (Fla. Dist. Ct. App. 2003)). It explained that "[t]he prosecution acts in good faith when it has probable cause to charge the third party at the time the prosecution offers leniency for the third party to the defendant or at the time the prosecution threatens the defendant with charging the third party." Id. (citing Miles, 61 F.3d at 1468; Stinson, 839 So.2d at 909).

- 26 -

Second, the Howell court held that "[t]he nature and terms of the package plea agreement must be disclosed to the trial court prior to questioning the defendant at the plea hearing." Id. (citing Hodge, 412 F.3d at 490-91; Mescual-Cruz, 387 F.3d at 8; Abbott, 241 F.3d at 34; United States v. Caro, 997 F.2d 657, 659-60 (9th Cir. 1993); Bey, 17 P.3d at 332; State v. Williams, 71 P.3d 686, 691 (Wash. Ct. App. 2003)). The court concluded that "[w]hen a defendant's plea rests on the prosecution's promise that a co-defendant will benefit, the promise is a material term of the plea agreement." Id. (citing Hodge, 412 F.3d at 490). The court reasoned that disclosure of such material terms allows trial courts to thoroughly question defendants about the possibility that they are entering a guilty plea against their will in order for a co-defendant to obtain leniency. Id. (citing Abbott, 241 F.3d at 34).

The Howell court stated that although some jurisdictions required the trial court to make additional inquiries when a defendant seeks to enter a guilty plea as part of a package plea agreement, it noted that the majority of the jurisdictions have declined to mandate additional inquiries beyond the state and federal mandates. Id. at 335-36. The court then concluded that "the current procedures trial courts in Tennessee are required to follow in guilty plea hearings are sufficient to assess the voluntariness of a guilty plea entered as part of a package plea agreement." Id. at 336. Although the Howell court clearly stated that "[a]dditional procedures are not mandated," it recognized the need for trial courts in these cases to carefully conduct the plea colloquy, giving special attention to the issue of whether the defendant's plea was voluntary. Id. (citing Hodge, 412 F.3d at 491; Mescual-Cruz, 387 F.3d at 8). The court clarified that "the existence of a package plea agreement is but one circumstance, in addition to those delineated in Blankenship, 858 S.W.2d at 904, a court may consider in determining whether a guilty plea was voluntarily, knowingly, and understandingly entered." Id.

Here, the record shows that although Petitioner's guilty pleas were heard and accepted by the trial court on January 16, 2014, the Petitioner's parents' cases were not resolved the same day. Because of an apparent oversight by both parties, the trial court was not notified that the State's promise of sentencing leniency to the Petitioner's parents was a part of the Petitioner's plea agreement. Our review of the transcript from the plea submission hearing shows that the trial court substantially complied with the federal and state mandates regarding guilty pleas. In particular, the trial court asked the Petitioner, "Any force, threats, or pressure of any kind to cause you to enter this best interest plea," and the Petitioner said, "No, sir." The court then inquired, "Anybody promise you anything other than what's on this Waiver Rights and Plea of Guilty form," and the Petitioner answered, "No, sir." We reiterate that the Petitioner's responses to these questions carry a strong presumption of truthfulness. See Blackledge, 431 U.S. at 74. We also conclude that the questions asked by the trial court in this case were "broad enough to encompass not only the traditional types of coercion but the unique pressures

from a co-defendant or family member that may arise in a package plea agreement." Howell, 185 S.W.3d at 336 (citing Mescual-Cruz, 387 F.3d at 9-10); cf. United States v. Martinez-Molina, 64 F.3d 719, 734 (1st Cir. 1995) (concluding that the trial court did not conduct an adequate inquiry into the voluntariness of the package plea agreement when it only asked the defendants whether they had been threatened or pressured by the prosecution and did not ask them whether they had been threatened or pressured by their codefendants); Abbott, 241 F.3d at 34 (stating that the transcript of the plea submission hearing "evidence[d] at best a cursory dialogue regarding voluntariness").

The record shows that the Petitioner was informed of his rights, understood that he was waiving these rights by entering a guilty plea, and was well-aware of the consequences of pleading guilty. It also shows that the Petitioner had sufficient opportunity to discuss the State's offer with defense counsel and his parents before entering his pleas. By entering a best interest plea to this package plea agreement, the Petitioner was able to avoid admitting to himself and the victim's family that his acts resulted in the death of the victim. See Alford, 400 U.S. at 37 ("An individual accused of crime may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."). He also was able to avoid a possible effective sentence of thirty-seven years for his charged offenses. Finally, the Petitioner was able to assure that his parents would not be incarcerated for their offenses.

At the post-conviction hearing, the Petitioner never indicated that there were threats or promises by his parents that induced him to plead guilty, and defense counsel testified that he believed the Petitioner made a knowing and voluntary waiver of his rights. The record indicates that the Petitioner's parents received the benefit of the package plea agreement, and we find it particularly troublesome that the Petitioner has attempted to use this aspect of the package plea agreement as a way of showing that his plea was involuntary. We agree with the post-conviction court's finding that the Petitioner's "extensive criminal history and familiarity with the criminal justice system" eliminates the concern that he was "confused or [did] not otherwise understand the nature and consequences of the decisions he [was] making." We have already determined that defense counsel did not provide deficient or prejudicial performance given the particular circumstances in this case, and the record shows that the Petitioner was provided sufficient opportunity to confer with defense counsel about his alternatives. In addition, the record shows that both defense counsel and the court properly advised the Petitioner regarding his charges and the penalties to be imposed. As we fully discussed in the prejudice section, the Petitioner had substantial reasons for entering his guilty pleas, namely his reduced sentence and the promise by the State that his parents would not be imprisoned. Accordingly, we fully agree with the post-conviction court's holding that the Petitioner's guilty pleas were voluntary, intelligent, and knowing. Although the

Petitioner asserts that he felt pressured to enter the plea agreement because he did not want to see his parents incarcerated, we note that "the desire to help a loved one and the accompanying emotional and psychological pressure do not, standing alone, render a guilty plea involuntary." Williams, 71 P.3d at 691-92.

Although the Tennessee Supreme Court in Howell made it clear that disclosure to the trial court of any package plea agreement terms is required, we do not believe that the failure to make this disclosure automatically renders a plea invalid. See Bey, 17 P.3d at 332 (holding that the failure to disclose any package deal terms "will not automatically render the acceptance of the plea invalid"); see also Williams, 71 P.3d at 691 (concluding that although the prosecution has a duty to inform the trial court that the co-defendant's plea is a part of a package deal, the State's failure to do so was harmless because it did not prejudice the defendant or affect the outcome of the proceeding). Howell stopped short of holding that the failure to disclose a package plea agreement inevitably renders the guilty plea involuntary, especially in cases, like the Petitioner's, where the trial court has conducted a thorough inquiry into the issue of voluntariness. See Howell, 185 S.W.3d at 335-37. We note that a substantial risk of coercive conduct occurs when the prosecution, in bad faith, threatens to prosecute the defendant's family member without probable cause to support such a charge. Bey, 17 P.3d at 332. Such is certainly not the case here, as the record shows that the prosecution possessed overwhelming evidence that the Petitioner's parents had committed the conspiracy offenses and that the Petitioner's parents were legitimately charged for their crimes. By offering not to seek incarceration for the Petitioner's parents if the Petitioner agreed to enter his guilty pleas, the State was merely "offering to refrain to taking action that it was legally authorized to take." Howell, 185 S.W.3d at 335 (citing Miles, 61 F.3d at 1469). Because the record fully supports the holding of the post-conviction court that the Petitioner's pleas were knowing, voluntary, and intelligent, we conclude that the post-conviction court properly denied relief.

## CONCLUSION

We conclude that defense counsel provided effective assistance and that the Petitioner knowingly, voluntarily, and understandingly entered his guilty pleas. Accordingly, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE